

# SUPREME COURT OF MISSOURI

C. DAVID ROUNER AND )
ALISHA HUDSON, )
  )
                   Appellants, )
  )
v. )      No. SC93679
  )
CARI RENEE WISE, INDIVIDUALLY AND )
AS CO-TRUSTEE OF THE K. R. CONKLIN )
LIVING TRUST, AND CARLI NICOLE )
CONKLIN, INDIVIDUALLY AND AS )
CO-TRUSTEE OF THE K. R. CONKLIN )
LIVING TRUST, )
  )
                   Respondents. )

### APPEAL FROM THE CIRCUIT COURT OF ADAIR COUNTY
The Honorable Karl DeMarce, Judge

### *Opinion issued October 14, 2014*

Cari Renee Wise and Carli Nicole Conklin (the "Children") became trustees of their father's inter vivos trust (i.e., the K.R. Conklin Living Trust ("Trust")) when Dr. Conklin died in 2009. They are being sued in their individual capacities and as trustees of the Trust by the children of Dr. Conklin's second wife, C. David Rouner and Alisha Hudson (the "Stepchildren").

The Stepchildren seek relief in three counts. First, they seek a declaration that they are beneficiaries of the Trust. Second, they seek an order requiring the Children to distribute certain Trust assets to them. Third, they seek a declaration that the Children

are no longer beneficiaries of the Trust because they violated its "no contest" provision. Following a bench trial, the circuit court entered judgment for the Children on all counts. This Court has jurisdiction of the Stepchildren's appeal. Mo. Const. art. V, § 10. The judgment is affirmed.

## I.     *Background*

The following facts were largely uncontested at trial and were found, explicitly or implicitly, by the trial court.

### A. *Dr. Conklin's Second Wife and Stepchildren*

Dr. Conklin's marriage to his first wife (i.e., the Children's mother) ended in divorce prior to the events in this lawsuit. In 1990, Dr. Conklin began living with Diana Jo Conklin, who would become his second wife ("Mrs. Conklin"), along with one Stepchild (David) and the Children. At that time, the Children were approximately 15 and 16 years of age and the Stepchildren were approximately five and ten years old. The other Stepchild (Alisha) lived part of the time with them and part with her father. All four children eventually left the couple's home to establish their own homes. Dr. Conklin and Mrs. Conklin were married in 2000 and remained married until Dr. Conklin's death in 2009.

### B. *The Trust and Pour-Over Will*

On October 24, 1996, Dr. Conklin executed (in the following order): (1) an agreement between himself as "Trustor" and himself as "Trustee" creating the Trust (the "1996 Agreement") and (2) a will giving his net probate estate to the Trust (the

"Pour-Over Will"). The will emphasizes that the Trust is an existing inter vivos trust and is not to be construed as a testamentary trust. *See* § 456.021.[1]

The 1996 Trust Agreement named Dr. Conklin as the sole trustee and designated the Children to serve as co-trustees upon his death. It provides that Dr. Conklin would receive all interest – and such principal as he may direct – from the Trust property during his lifetime and that he could make additional contributions (or withdrawals) of property to the Trust by "written direction delivered to my Trustee." Finally, Dr. Conklin expressly reserved the right in the 1996 Agreement to "amend, modify, alter, revoke or terminate my trust … at any time in whole or in part."

The terms of the Trust are simple and straightforward. The beneficiaries are a class consisting of all Dr. Conklin's natural and/or adopted children at the time of his death. The 1996 Agreement and the Pour-Over Will recite that the only members of this class are the Children, but the beneficiary class remained open in the event additional children were born to or adopted by Dr. Conklin before his death.

Upon Dr. Conklin's death, the Trust property was to be divided into shares equaling the number of beneficiaries (including those who pre-deceased him). Shares belonging to pre-deceased children were to be distributed immediately, free of the Trust, to (or, if a minor, for the benefit of) the living descendants of those beneficiaries. Those beneficiaries who survived Dr. Conklin, on the other hand, were not to receive their shares outright. Instead, they would receive only the interest from their share plus whatever principal distributions the trustees in their discretion deemed necessary for that

---

[1] Unless otherwise stated, all statutory references are to the RSMo Supp. 2013.

beneficiary's "health, maintenance, support and education." When each beneficiary died, that child's share was to be distributed, free of the Trust, to (or, if a minor, for the benefit of) that beneficiary's living descendants.

In the 1996 Agreement, Dr. Conklin purported to "assign, convey, transfer and deliver" to the trustee all of the real and personal property that he owned at that time. The agreement makes no effort to identify any of this property specifically, however, and there was no evidence at trial establishing what property was transferred to the Trust, either upon its creation or at any time thereafter (including by operation of the Pour-Over Will).[2]

Even though Dr. Conklin began living with the future Mrs. Conklin and the Stepchildren in 1990, neither the 1996 Agreement nor the Pour-Over Will makes any mention of them. The Stepchildren, of course, would have been entitled to distributions of interest (and perhaps principal) from the Trust under the terms of the 1996 Agreement

---

[2] Attached to the 1996 Agreement, Dr. Conklin executed an "Assignment of Tangible Personal Property" purporting to transfer to the trustee all of Dr. Conklin's (unspecified) tangible personal property. Even assuming this assignment was effective, there was no evidence at trial showing what tangible personal property Dr. Conklin owned in 1996. In addition, the 1996 Agreement did not convey any of Dr. Conklin's real property to the trustee because it does not describe any item of property with sufficient particularity to serve as a deed. Nor was there any evidence at trial showing that Dr. Conklin separately conveyed particular pieces of real property to himself as trustee, either upon the Trust's creation or thereafter. Finally, there was no evidence showing whether Dr. Conklin removed any property (real or personal) from the Trust, either by way of partial revocation of the Trust or by conveyance from himself as trustee to himself in his individual capacity. At trial, the Children asked the court (without objection) to take judicial notice of the record from the probate proceedings concerning Dr. Conklin's estate (including, but not limited to, an unsuccessful discovery of assets action against Mrs. Conklin filed by the Children as co-administrators of their father's probate estate). The Stepchildren failed to include these records in their Record on Appeal, however. As a result, this Court does not have the benefit of whatever light those records shed on the question of which assets are subject to the

4

if Dr. Conklin had adopted them, and their living descendants would have been entitled to receive (free of the Trust) each Stepchild's share upon that Stepchild's death. But Dr. Conklin did not adopt the Stepchildren, either before he married their mother in 2000 or at any time prior to his death in 2009. Accordingly, the Stepchildren concede they are not beneficiaries of the Trust under the terms of the 1996 Agreement.

### C. The 2002 Letter

On November 1, 2002, Dr. and Mrs. Conklin left their rural Missouri home for the Kansas City airport. From there, they planned to fly to Arizona to help Dr. Conklin's mother close her home there. Afterward, they planned to drive one of the mother's cars back to Iowa, drop it off, and return to their home in Missouri. On the way to the airport, Dr. Conklin wrote – and both he and Mrs. Conklin signed – the following:[3]

> *NOV 1, 2002*
>
> *Cari, Carla, David & Alisha,*
>
> *Am writing this in the car on the way to KC, MO so excuse the penmanship.*
>
> *If you are reading this it means that Jo & I have met our demise either going to or coming back from Phoenix.*
>
> *The trust has not been updated for several years so I will express my desire on how I wish everything to be handled.*
>
> *My life insurance (250,000) is to be used to pay off the loan against the apartments (120,000). The balance of it (after taxes) to be used to pay off the mortgage [sic] (at NEMO bank) against the house.*
>
> *Cash flow from the apartments will meet the payments on the Zimmerman farm (16,000/yr on Mar 1, 2003, 2004 & 2005) to Bob Zimmerman and will make the portion of the Glidwell farm payment to Donald Glidwell on Dec*

Trust today, let alone which assets were transferred to the Trust prior to the November 2002 Letter.

[3] There was no dispute at trial regarding the authenticity of this handwritten letter or the accuracy of the following transcription.

*31, 2002, 2003, 2004 & 2005 that the farm doesn't generate. Farm generates around 10,000 clear/yr - payment is 33,000/yr.*

*After the farms are paid for, I want David and Alisha to have the apt at 710 S. First Street and Cari and Carli to have the apt at 708 S. First St.*

*The farm north of Novinger by Lee Kittles will go to Cari and Carli.*

*The Zimmerman farm will go to Cari, Carli, David & Alisha, ¼ undivided interest to each. If one of the four or two of the four wants to purchase the farm, I would want them to have it at a fair market appraised value to be fair to those selling their interest. If all decide to sell, I would think keeping it for several years & then maybe splitting it In to smaller parcels would be the best alternative for maximum selling price. The rental income will more than pay the taxes and general expenses so there would be no need to sell it.*

*I don't want the Glidwell farm sold. I wish all four of you (Cari, Carli, David, Alisha) to have an undivided ¼ interest. Later in your lives you can all decide whether to pass it to your families or to sell.*

*We wish to have the proceeds of Jo's life insurance (100,000) given to Davie & Alisha.*

*We wish to have Parkview Animal Hospital sold and the proceeds to Cari and Carli.*

*We wish to have the residence at 406 Suburban Drive sold and the proceeds first used to pay all student loans for Carli, David & and those that Alisha will incur through college, hoping she doesn't desire to study in France or England ☺ the remainder to be split equally between you four children.*

*All tractors and equipment to stay with the farms. All of my personal tools I would like to have kept by any of you children or your spouses that will use them.*

*All vehicles are to be sold at fair market value & the proceeds equally divided.*

*I wish to have all of my collector guns (pistol shotguns & rifles) to be entrusted to my brother Ron to sell through someone who knows and can get the best price for them. I wish for the proceeds to be divided 1/5 for each child & 1/5 for Ron for his assistance.*

*I wish for my modern guns (4 pistols, 4 High Powered rifles, 2 short barreled shotguns) to be equally distributed on a fair market value monetary basis between all four children. Each may elect to keep or sell the guns.*

*Above all, I wish to have no fighting or bickering between the four of you - You will all do well in life if you crawl before you walk, use your common sense, plan, manage and be patient.*

*It has been our pleasure to be your parents.*

*/s/ KR Conklin*
*/s/ Jo Conklin*

Because the Stepchildren are not beneficiaries of the Trust – and have no claim to any Trust assets – under the terms in the 1996 Agreement, their three-count amended petition rests entirely on their allegation that Dr. Conklin intended the foregoing handwritten letter (the "2002 Letter") to be an amendment to his Trust.[4]

As indicated, the letter is addressed to the Children and the Stepchildren, collectively. There was no evidence that Dr. Conklin ever attempted to deliver it to these addressees, however, either when it was written or at any time prior to his death. Instead, Dr. Conklin sealed the letter in an envelope, addressed it to Cari Conklin alone, and left the envelope in the glove compartment of his car in the airport parking lot.

Sometime after returning from Arizona, Mrs. Conklin found the letter (unopened) in the car. Rather than delivering it to Cari Conklin or the other addressees, however, she apparently returned it to Dr. Conklin. Following

---

[4]  Article VI of the Trust authorizes the trustee to "make specific distributions of trust property to any beneficiaries under this Trust agreement upon my death … as may be set out in a memorandum for Distribution of Tangible Personal Property, letter or other writing executed by me which is in existence at the time of my death."  The Stepchildren, however, do not assert Article VI as a stand-alone basis for their claims, independent of the 2002 Letter.  Because this provision only authorizes distributions to those individuals who are identified in the Trust as "beneficiaries,"  it can only be invoked by the Stepchildren if they can establish that Dr. Conklin intended for the 2002 Letter to amend the Trust and make them beneficiaries.

7

Dr. Conklin's death, the letter (opened) was discovered among his records (though not, the Stepchildren concede, with or as a part of Dr. Conklin's Trust papers).

### D. Trial Court Proceedings

At trial, the Stepchildren offered the Trust, the 2002 Letter (and the envelope in which it was found), and brief testimony from Mrs. Conklin identifying the parties and the foregoing exhibits. Then, because the Stepchildren contended that the 2002 Letter unambiguously proves that Dr. Conklin intended for the letter to amend the terms of the Trust, they rested without offering further evidence.

The Children argued that nothing in the 2002 Letter purports to amend the Trust and, even if the letter could be read to do so, Dr. Conklin plainly intended for it to be effective only if both he and Mrs. Conklin died during their trip to Arizona in November 2002. Because the couple returned from that trip safely, the Children insisted that Dr. Conklin intended for the 2002 Letter to have no legal effect. When the Children offered extrinsic evidence to buttress these arguments, the Stepchildren argued that such evidence was inadmissible because the 2002 Letter is unambiguous. The trial court overruled the Stepchildren's objection on the basis that the 2002 Letter is ambiguous as to whether (and on what conditions) Dr. Conklin intended that letter to amend the Trust.

After trial, the trial court entered judgment for the Children on all three counts of the Stepchildren's amended petition. The judgment declares that the 2002 Letter "was conditional and contingent in nature; that the condition set forth therein was never satisfied; [and] that, therefore, the 2002 [Letter] never became operative as an amendment" to the Trust. The judgment further states that, pursuant to section

8

456.10-1004, the Children may reimburse their attorneys' fees and expenses from the Trust.

## II. Analysis

The standard of review in a declaratory judgment action is the same as in any other court-tried case. *Guyer v. City of Kirkwood*, 38 S.W.3d 412, 413 (Mo. banc 2001). "The judgment will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Levinson v. State*, 104 S.W.3d 409, 411 (Mo. banc 2003).

Here, however, the Stepchildren contend that the 2002 Letter is unambiguous and cannot be construed to support the trial court's judgment. The Stepchildren argue that this Court's review is de novo because both the existence of an ambiguity and the construction of an unambiguous document are questions of law. In this, the Stepchildren are correct. *See Obermeyer v. Bank of Am., N.A.*, 140 S.W.3d 18, 22 (Mo. banc 2004) ("Court owes no deference to the trial court's judgment in a case where the sole question is the construction of documents based on the language they employ."); *Estate of Boder*, 850 S.W.2d 76, 79 (Mo. banc 1993) (same); *Helmer v. Voss*, 646 S.W.2d 738, 742 (Mo. banc 1983) ("We reach our conclusion almost entirely on the basis of our reading of the will. Factual matters play a very small part.").

Finally, appellate courts are "primarily concerned with the correctness of the trial court's result, not the route taken by the trial court to reach that result." *Business Men's Assur. Co. of Am. v. Graham*, 984 S.W.2d 501, 506 (Mo. banc 1999). To that end, the judgment must be "affirmed if cognizable under any theory, regardless of whether the

9

reasons advanced by the trial court are wrong or not sufficient." *American Eagle Waste Indus., LLC v. St. Louis County*, 379 S.W.3d 813, 829 (Mo. banc 2012). This rule is applicable particularly when the trial court reaches the "correct result in a declaratory judgment action." *Edgar v. Fitzpatrick*, 377 S.W.2d 314, 318 (Mo. banc 1964) (rejecting the trial court's conclusion that a valid trust was created, but affirming judgment that the property in dispute should be included in decedent's estate when calculating spouse's share).

In their first three points, the Stepchildren claim that the trial court erred by "holding that the November 1, 2002, Amendment to the K.R. Conklin Living Trust was conditional upon the return of decedent from a trip." Their fourth point claims that the trial court erred by admitting extrinsic evidence "to determine whether decedent intended to make the November 1, 2002, Amendment to the … Trust, conditional or absolute." As capsulized in their appellate brief, therefore, all four points proceed from the Stepchildren's contention that the 2002 Letter unambiguously amended the Trust and, as a result, the trial court erred by not declaring that amendment to be "unconditional and operative upon the Decedent's death."

In response, the Children argue that this Court need not resolve the question of whether the 2002 Letter was a conditional or unconditional amendment to the Trust. Instead, they contend that the judgment should be affirmed on the alternative ground that

the Stepchildren failed to prove that Dr. Conklin intended the 2002 Letter to amend the Trust at all.[5]  The Court agrees.

The Stepchildren had the burden of proving that Dr. Conklin understood and intended the 2002 Letter to amend the Trust.  To carry this burden, they relied exclusively on the "four corners" of the 2002 Letter.  Nothing in the plain language of that letter declares that this was Dr. Conklin's understanding or intent, however, and there is no compelling basis to infer this essential element.  Even the extrinsic evidence, which the Stepchildren insist cannot be considered, provides no basis for concluding that Dr. Conklin understood and intended for the 2002 Letter to amend the Trust.  Accordingly, the Court affirms the trial court's judgment in favor of the Children on this alternative ground.  Because the Stepchildren failed to prove that Dr. Conklin intended the 2002 Letter to serve as an amendment to the Trust, the Court does not reach or decide the question of whether (if Dr. Conklin had so intended) any such amendment would be valid and, if so, whether it was conditional or absolute.[6]

---

[5]  The Stepchildren contend that the Children are barred from arguing that the trial court erred in deciding that the 2002 Letter constituted a valid (albeit conditional) amendment to the Trust because they failed to file a cross appeal.  This is incorrect.  The right to appeal is statutory, and section 512.020 extends that right only to parties who are "aggrieved" by a judgment.  Because the trial court ruled for the Children on all counts, they were not "aggrieved" by that judgment.  Moreover, this Court has long held that a "respondent may attack erroneous rulings of the trial court for the purpose of sustaining a judgment in respondent's favor." *Bellamy v. Pac. Mut. Life Ins. Co.*, 651 S.W.2d 490, 493 n.3 (Mo. banc 1983) (affirming on alternative grounds by rejecting trial court's construction of the writing at issue).  Because the Children prevailed below, they are "entitled to advance any argument here in support of the judgment." *Coldwell Banker Residential Real Estate Services, Inc. v. Missouri Real Estate Comm'n*, 712 S.W.2d 666, 668 n.1 (Mo. banc 1986).  See also Rule 84.04(f) (respondent may raise "additional arguments in support of the judgment that are not raised by the [appellant's] points relied on").

[6]  The trial court concluded that Dr. Conklin intended for the 2002 Letter to amend the Trust only if he and Mrs. Conklin died on the trip to Arizona.  The Stepchildren, on the other hand,

11

## A. Stepchildren Failed to Prove the 2002 Letter Amended the Trust

Neither an express trust nor an amendment thereto can come as a surprise to the settlor. Instead, an "express trust can come into existence only by the manifestation of an intention to create the kind of relationship known in law as an express trust." *Warwick v. De Mayo*, 213 S.W.2d 392, 395 (Mo. 1948); s*ee also* § 456.4-402 ("a trust is created only if … the settlor indicates an intention to create the trust" and "the trust has a definite beneficiary"). Accordingly, a party seeking to establish an express trust must prove the settlor's intent regarding:

> (1) a beneficiary, (2) a trustee, (3) a trust res so sufficiently described or capable of identification that title thereto can pass to the trustee, [and] (4) actual delivery of the corpus, its character considered[,] or a legal

maintain that Dr. Conklin intended an unconditional amendment that "became operative upon his death." Both constructions, however, result in an amendment intended to be effective only upon Dr. Conklin's death. Such an amendment – even if adequately proved – raises difficult and as yet unanswered questions. A statement of intent to transfer property in trust in the future does not create a trust and is simply a nullity. *See Edgar*, 377 S.W.2d at 317 (Mo. banc 1964). A writing evidencing an intention to amend a trust in the future – especially one that purports to add new property to the trust in the future – may fall within this same rule. *See Atl. Nat'l Bank of Jacksonville, Fla. v. St. Louis Union Trust Co.*, 211 S.W.2d 2, 7 (Mo. 1948) (that settlor "may have had a desire or intention that 'from and after' his decease a trust should then come into existence is not sufficient. To have effected a valid trust, as of the time of the execution of the indenture [the settlor] must have parted with dominion over the legal title."). In addition, Dr. Conklin's authority to amend the Trust ended with his death because the 1996 Agreement stated expressly that "[a]fter my death this trust … shall be irrevocable and not subject to amendment." As a result, Dr. Conklin may not have had authority to make an amendment which he intended to take effect only after he died. Finally, to the extent the 2002 Letter was intended to transfer new property to the Trust only upon Dr. Conklin's death, it was an attempted testamentary disposition and would have no legal effect because it does not comply with the statutes governing the signature and attestation of wills. *See Sims v. Brown*, 158 S.W. 624, 627 (Mo. 1913) (when an instrument shows "that no estate or interest is to pass until the death of the grantor, then it is considered to be testamentary in character, and … if not executed in form and manner required of a will it is of no force or effect for any purpose"); Restatement (Second) of Trusts § 56 (1959). The Court need not resolve these issues in this case, however, because the Stepchildren failed to prove Dr. Conklin intended for the 2002 Letter to serve as an amendment of the Trust, at any time or under any conditions.

assignment of the same to the trustee actually conveying present title to the trustee; or the retention of title by the owner under circumstances which unequivocally disclose an intent to hold it for the use of another.

*Atl. Nat'l Bank of Jacksonville, Fla. v. St. Louis Union Trust Co.*, 211 S.W.2d 2, 5 (Mo. 1948).[7]

To recover on the basis of an amendment to an express trust, a party must establish other elements in addition to the foregoing. First, the party must prove that the settlor had – and intended to exercise – authority to amend the trust. Then, if the alleged amendment purports to alter original trust provisions concerning the beneficiary, the trustee, and/or the instructions regarding trust property, a party relying on that amendment must prove the settlor intended to supplement or replace those terms with the amended ones. Finally, if the alleged amendment purports to add specific property to a trust,[8] the party must prove that the settlor intended to – and did – convey legal title to

---

[7]  A party seeking to establish an original or amended trust also must establish that the settlor acted with adequate capacity. *Ivie v. Smith*, __ S.W.3d __ (No. SC93872, decided July 8, 2014) 2014 WL 3107448, at *7 (Mo. banc 2014) ("capacity required to make or amend a revocable trust is the same as that required to make a will"). Dr. Conklin's capacity is not in dispute.

[8]  Strictly speaking, an amendment adding property to an existing trust is not an "amendment" at all. Instead, the settlor is creating a new trust with respect to the additional property, albeit one that utilizes a previously identified trustee and beneficiary and that relies upon previously established instructions concerning the trust property. "In simple terms, a trust (not qualified by 'charitable,' 'resulting' or 'constructive') may be defined as 'a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it.'" *Masterson v. Plummer*, 343 S.W.2d 352, 355 (Mo. App 1961) (quoting Restatement (Second) of Trusts § 2 (1959)). As a matter of practice, however, changes to the beneficiary, trustee, and/or instructions terms of a trust often are coupled with changes to the trust assets, and these changes are then made by or memorialized in a document(s) referred to as the trust "amendment."

specific property to the same trustee for the benefit of the same beneficiary and subject to the same instructions as the remainder of the trust property.

Ordinarily, the proof needed to establish the elements of an initial or amended trust will be supplied by one or more signed writings that plainly manifest the settlor's intent. Bogert & Hess, *Trusts and Trustees* § 45, p.466-67 (3d ed. 2007). A signed writing is mandatory, however, only if the trust pertains to real property. *See* § 456.4-407. Otherwise, an express trust may be proved by any evidence tending to establish the settlor's manifested intention. *Platt v. Huegel*, 32 S.W.2d 605, 606 (Mo. 1930) ("an express trust may be proved not only by express declarations, but also by […] evidence of the acts and declarations, either oral or written, of the parties, as well as the surrounding circumstances"). "But whether a completed express trust is sought to be established by parol or by a written instrument, the evidence relied upon to establish it must be clear and convincing and so full and demonstrative as to remove from the mind of the chancellor any reasonable doubt with respect thereto." *Atl. Nat'l Bank of Jacksonville*, 211 S.W.2d at 5.

Here, the Stepchildren concede that they are not beneficiaries (and, therefore, have no rights to any Trust property) under the terms set forth in the 1996 Agreement. They do not rely on any parol evidence and, in fact, they argue that such evidence cannot be considered. Instead, they contend that the plain language of the 2002 Letter unambiguously manifests Dr. Conklin's understanding and intent that the letter would serve as an amendment to the Trust: (1) adding the Stepchildren to the class of beneficiaries defined in the 1996 Agreement; (2) changing the distribution instructions in

14

the 1996 Agreement; and (3) transferring new items of property to the trustee for the benefit of the newly defined beneficiaries and subject to the newly altered instructions. The Court disagrees.

### 1. *Authority to Amend*

As noted above, a party seeking to establish an amendment to an express trust must first prove that the settlor had (and intended to exercise) authority to amend the trust. *Love v. St. Louis Union Trust Co.*, 497 S.W.2d 154, 159 (Mo. banc 1973). Here, Dr. Conklin reserved the right to "amend, modify, alter, revoke or terminate" the Trust in the 1996 Agreement. To exercise this right, the 1996 Agreement provides that an "amendment or revocation of this trust agreement must be delivered to my Trustee in writing." Under this provision, therefore, the Stepchildren contend that the 2002 Letter must be an amendment to the Trust because it is a "writing" that Dr. Conklin "delivered" to himself as trustee when he wrote it.

Under the 1996 Agreement, Dr. Conklin plainly had authority to amend the trust. But evidence that he had such authority generally is not evidence that he intended a particular writing to be an exercise of that authority. Under the Stepchildren's logic, every document that Dr. Conklin wrote (or possessed) while he was trustee must necessarily be treated as an amendment to the Trust. But the relevant provision of the 1996 Agreement does not refer to "all writings;" it refers to an "amendment." As a result, this provision applies only to a writing that Dr. Conklin understands and intends will amend the Trust. *See* § 456.6-602.3 (express trust may be modified by the method

15

described in the trust or, if none, by "any *other* method manifesting clear and convincing evidence of the settlor's intent" to amend) (emphasis added).

Accordingly, the question is not whether Dr. Conklin had the authority to amend the Trust in the abstract; he did. The question is whether Dr. Conklin intended the 2002 Letter to be an exercise of that authority. *See Mercantile Trust Co. v. Kilgen*, 298 S.W.2d 387, 391 (Mo. 1957) (settlor expressly reserved power to modify, but claimant still must prove settlor intended letter to be an exercise of that power). The Stepchildren's proof on that question falls well short of the applicable clear and convincing standard.

### 2. *Instrinsic Evidence of Dr. Conklin's Intent*

The search for Dr. Conklin's intent regarding the purpose and effect of the 2002 Letter begins with the "four corners" of that document.[9] *St. Louis Union Trust Co. v. Herf*, 235 S.W.2d 241, 247 (Mo. 1951). In construing the letter, it must be read as a whole, without giving undue importance to any particular word or phrase. *Mercantile Trust Co.*, 298 S.W.2d at 390. It also should be read in light of the 1996 Agreement, which it allegedly modifies. *Id. at 391.* Finally, the language of the letter should be given its ordinary and natural meaning unless some other meaning is plainly intended. *Gardner v. Vanlandingham*, 69 S.W.2d 947, 950 (Mo. 1934).

Disputes over the *terms* of express trusts are common, and numerous opinions have been written over the years attempting to divine a settlor's intent with regard to a disputed term. Disputes over whether a settlor intended a particular writing to create or

---

[9] The Stepchildren insist that this search is limited to the "four corners" as well. This argument is incorrect and is addressed separately below.

16

amend a trust at all, on the other hand, are rare. *See Mercantile Trust Co.*, 298 S.W.2d at 390 (settlor's letter not intended to amend trust). This is likely because, when a settlor uses a document to create or amend an express trust, that document usually will contain an unambiguous statement of what the settlor intends the document to be and do. In many instances, one need look no further than the title of the document to find such a statement, e.g., "Trust Agreement," "Declaration of Trust," or "Amendment to Trust." Here, for example, the 1996 Agreement contains numerous statements that provide clear and convincing proof of Dr. Conklin's intention regarding the nature and purpose of that document.

The Stepchildren's claims, on the other hand, depend on the 2002 Letter. On its face, this document purports to be a "farewell" letter from Dr. and Mrs. Conklin to their children, nothing more.[10] It is not titled "Amendment to K.R. Conklin Living Trust," nor does it contain any other similarly unambiguous statement that it was intended to serve that function.

In attacking the trial court's conclusion that the 2002 Letter was (at most) only a conditional amendment to the Trust, the Stepchildren insist that such an intention must be stated explicitly. They argue, for example, that only the following statement (or

_____

[10] The Stepchildren argue that Dr. Conklin could have intended the 2002 Letter to serve two purposes, i.e., an amendment to his Trust if he died under any circumstances and a farewell letter to the Children and Stepchildren from Dr. and Mrs. Conklin if they died simultaneously on the 2002 trip to Arizona. This is possible, of course, but a possibility is not proof. There was no evidence from which to infer that Dr. Conklin actually intended the 2002 Letter to serve the former purpose, especially when the only purpose that is unambiguously present within the "four corners" of the document is the latter.

17

something substantially similar) would suffice:  "If we die on this trip then, and only then, will this document *serve as my amendment to the trust*."  [Emphasis added.]  In their haste to point out the mote in the eye of the Children's logic, the Stepchildren are oblivious to the log in their own.  Nowhere in the 2002 Letter does Dr. Conklin say that it will "serve as my amendment to the trust," or anything remotely similar.  Accordingly, the Stepchildren's proof fails under the very standard they insist must be met.

In fact, the *only* reference[11] to the Trust in the 2002 Letter is in the third sentence, which reads:  "*The trust has not been updated for several years so I will express my desire on how I wish everything to be handled*."  At most, this sentence shows that Dr. Conklin believed the Trust should have been amended to address the possibility that he and Mrs. Conklin might die simultaneously.  What this sentence does not show, however, is that Dr. Conklin understood and intended the 2002 Letter, itself, would serve to amend the Trust.

The third sentence cannot be read in isolation.  Instead, Dr. Conklin's use of the word "everything" (as in, "how I wish everything handled") refers to the circumstances described in the preceding sentence:  "*If you are reading this it means that Jo & I have met our demise either going to or coming back from Phoenix.*"  Reading both sentences together, it is reasonable to infer that Dr. Conklin meant:  "*The trust has not been updated*

---

[11]   Even saying that the third paragraph of the 2002 Letter "refers" to the Trust is giving the Stepchildren the benefit of the doubt to which they (as the party with the burden of proof) are not entitled.  The letter nowhere identifies the "trust" to which this sentence refers.  The Stepchildren assume that the reference is to the Trust created by the 1996 Agreement but, in the absence of any evidence that Dr. Conklin only had one trust (i.e., the Trust), the Stepchildren's assumption is unsupported.

*for several years so I will express my desire on how I wish everything to be handled in the event Jo & I have met our demise either going to or coming back from Phoenix.*" This is the reading that the trial court adopted.

Where the trial court erred – and the fundamental flaw in the Stepchildren's argument – is in equating Dr. Conklin's statements in the 2002 Letter (i.e., that he "wished" or "desired" certain property to be distributed contrary to the terms of the Trust in the event he and Mrs. Conklin were to die in a common disaster on their trip to Arizona) with Dr. Conklin's intention to have the 2002 Letter serve as an amendment to the Trust such that the successor trustees would be legally obligated to make the distributions under those circumstances. The two are vastly different and, in this case, that difference is dispositive. As a result, even assuming that Dr. Conklin believed he could effect such an amendment by means of a handwritten letter addressed to his Children and Stepchildren, there simply is no evidence suggesting that this is what he understood and intended the 2002 Letter to do.

Nowhere in the 2002 Letter does Dr. Conklin use the word "amend," "alter," "add," or "change." To be sure, there are no "magic words" that a settlor must invoke to create or amend a trust. *In re Soulard's Estate*, 43 S.W. 617, 622 (Mo. 1897) ("It is well settled that no particular words are necessary to declare a trust. [If] the language sufficiently expresses an intention to create a trust, that will be sufficient"). But it is not reasonable to infer, as the Stepchildren insist the Court must, that Dr. Conklin knew and intended for the 2002 Letter to amend his Trust even though he failed to use the word

19

"amend" (or any reasonably synonymous term) in describing the changes he intended the letter to impose.

Several other aspects of the letter weigh against the inference that Dr. Conklin intended for the letter to serve as an amendment to the Trust. First, because Dr. Conklin is presumed to know the terms of the 1996 Agreement, he would know that no amendment would be effective unless delivered to the trustee. Yet nothing in the 2002 Letter suggests that he was intending to comply with (or waive) that requirement. Instead of addressing the 2002 Letter to himself as trustee, for example, Dr. Conklin addressed it to the Children and Stepchildren. Dr. Conklin failed to include anything in the letter to indicate to the Children (as successor trustees) that he believed the letter was an amendment to the Trust and that he had "delivered" the letter to himself for purposes of making it effective.

Second, the "desires" set forth in the 2002 Letter are a wholesale departure from the terms of the 1996 Agreement, under which no beneficiary would receive specific property upon his death, but only interest from shares plus discretionary distributions for "health, maintenance, support, and education." Instead, the principal would remain in the Trust and be distributed, free of the Trust, only to the beneficiaries' descendants. According to the Stepchildren, Dr. Conklin decided to toss all this aside and replace it with a garden variety "who-gets-what" list of instructions for the successor trustees to carry out immediately upon his death. Surely he was entitled to make such a change but, just as surely, he would have given some indication if that is what he intended the 2002 Letter to require.

20

The third aspect of the 2002 Letter that weighs against the inference that Dr. Conklin intended it to amend the Trust is that the letter deals with property that was not subject to the Trust when the letter was written and that would not become subject to the Trust pursuant to his Pour-Over Will except under very limited circumstances. As noted above, there was little evidence at trial (and even less in the record on appeal) showing what property was subject to the Trust in 1996 and 2002, or what property is subject to the Trust now. Where there is evidence, however, it tends to show that the property was not subject to the Trust, either in 2002 or today.[12]

For example, the "Zimmerman Farm" referred to in the 2002 Letter was owned at that time by Dr. and Mrs. Conklin as tenants in common. In 2005, they retitled this property to hold it as joint tenants, and it passed to Mrs. Conklin upon Dr. Conklin's

---

[12]  The inference that the Stepchildren would have the Court draw (i.e., that Dr. Conklin intended the letter to amend the Trust) is stronger if the property referenced in the letter was subject to the Trust in 2002, and weaker if it was not. But evidence as to the nature and ownership of the property referenced in the 2002 Letter is, in the strictest sense, "extrinsic" evidence because it establishes facts not included in or reasonably inferred from the document. The Stepchildren, while objecting vigorously to consideration of extrinsic evidence concerning Dr. Conklin's statements and actions on the question of whether he intended the 2002 Letter to be an amendment to the Trust, raise no similar objection concerning extrinsic evidence that merely identifies the property referred to in the 2002 Letter or describes how that property was owned when the letter was written. Like many informal writings, the 2002 Letter is replete with shorthand references to people and places that would be unintelligible without some extrinsic evidence to inform our understanding. Such evidence does not offend the four corners rule because it is not offered to contradict trust terms in an unambiguous writing intended to be final or to augment such terms in an unambiguous writing intended to be complete. Accordingly, this evidence is properly considered. *Neal v. Bryant*, 235 S.W. 1075, 1076 (Mo. 1921) ("when essential to a true understanding of its meaning, [the writing must] be read in the light of all the facts and circumstances attendant upon its making, and which would be presumed to have been in the mind of the one who issued it at the time of its issuance"); *See also* Bogert & Bogert, *Trusts and Trustees* § 88, p.211-13 (2d ed. 1984) (citing *Sinclair v. Purdy*, 139 N.E. 255, 257 (N.Y. 1923) (Cardozo, J.) ("That is the background which gives to the figures in the foreground their position and perspective. We must read the letter in its setting.")).

death. There was no evidence that Dr. Conklin's interest as a co-tenant had been transferred to the Trust prior to 2002, and certainly no suggestion in the letter that he (far less, that he and Mrs. Conklin) intended to make such a transfer. It appears, therefore, that this property was not subject to the Trust in 2002, and there is no reason to believe that Dr. Conklin thought it (or any part of it) would pass to the Trust upon his death. As a result, it is unreasonable to infer that he would have been trying to direct its disposition by instructing the Children as his successor trustees. Instead, the more reasonable inference is that, through the 2002 Letter, Dr. and Mrs. Conklin were telling their children how they wanted their property disposed of in the event of their simultaneous deaths *notwithstanding* the requirements of their separate wills and trusts.

Another example is the reference in the 2002 Letter to Dr. Conklin's Animal Hospital. The record is silent as to whether it was owned by the Trust in 2002, or by Dr. Conklin individually. The evidence does show, however, that Dr. Conklin later disposed of this asset and that Mrs. Conklin retained what remained of the proceeds when he died. As a result, there is no basis to conclude it was subject to the Trust in 2002, and the proceeds clearly are not subject to the Trust now. Similarly, there was evidence that one of the vehicles referred to in the 2002 Letter was held in the Trust (at least in 2009), but that Dr. Conklin owned the other vehicle personally. As a result, references to the hospital and these vehicles in the letter suggest that the only purpose of the 2002 Letter was for Dr. and Mrs. Conklin to communicate their "desires" as to how all of their

property should be handled in the event the two died simultaneously, ***regardless*** of how their respective estate planning documents required that property be disposed.[13]

The last aspect of the 2002 Letter that weighs against the Stepchildren's argument that Dr. Conklin intended the letter to serve as an "amendment" to the Trust is the nature of the language used throughout the letter. The language of the 1996 Agreement is unambiguous and mandatory in its directions regarding the distributions that the successor trustees "shall" and "shall not" make. The language of the 2002 Letter, on the other hand, is written in terms of what Dr. Conklin (and sometimes Mrs. Conklin) "desire" and how he (or they) would "wish" everything to be handled in the event of their simultaneous deaths. Nearly two-thirds of what the Stepchildren contend are legally binding instructions for the "disposition" of specific trust property are, in reality, mere statements of how (or to whom) Dr. Conklin and, in some cases, Mrs. Conklin "wish" or "want" (or do "not want") certain items handled. As noted above, the statements are made without regard to whether the particular property was – or ever could be – subject to the Trust.

Historically, Missouri courts have been hesitant to find an intention to create a trust when the settlor uses such precatory language. *Estill v. Ballew*, 26 S.W.2d 778, 780 (Mo. 1930) (noting that "there are many cases in which the courts, considering that it did not appear that the testator intended to make them imperative, have held that no trust was

---

[13]   The Stepchildren make repeated reference to the provision of the Trust that allows Dr. Conklin to transfer property freely into and out of the Trust during his lifetime. But, as with the power to amend the Trust, the point is not whether Dr. Conklin had the power to add or remove property from the Trust but whether he intended the 2002 Letter to do so.

created by the use of such precatory words as 'wish,' 'will,' 'will and desire,' 'request,' etc."). Here, the ordinary meaning of the language in the 2002 Letter does not suggest that it was meant to bind the addressees legally or compel the stated distributions. Instead, it merely advises the Children and Stepchildren how Dr. and Mrs. Conklin "wanted" or "wished" the referenced property to be "handled" in the event they died simultaneously, even though the Children (as trustees) were under no legal obligation to do so. This language does not suggest that Dr. Conklin believed the letter could – and did – alter those legal obligations in the way the Stepchildren suggest.

Accordingly, the Court holds that the language of the 2002 Letter does not provide any clear and convincing basis – directly or by any fair inference – for concluding that Dr. Conklin understood and intended for that letter to serve as an amendment to the Trust.[14]

### 3. Extrinsic Evidence of Dr. Conklin's Intent

The trial court's conclusion was not based solely on the language of the 2002 Letter, however, but also on extrinsic evidence of Dr. Conklin's intent. First, the trial court relied on evidence that – while in Arizona during the 2002 trip – Dr. Conklin told one of his brothers that he had written a letter to assuage Mrs. Conklin's concerns over how the Stepchildren would be provided for should both Dr. and Mrs. Conklin die during

---

[14] The Stepchildren rely heavily on *Helmer v. Voss*, 646 S.W.2d 738 (Mo. banc 1983), but it has no relevance here. In *Helmer*, there was no dispute as to what the parties intended the document to be; it was a will and the parties plainly intended it to operate as such. The only question in *Helmer* was whether the parties' language of condition should be applied to the entire will or limited to the clauses in which it appears. *Id*. at 742. The Court here finds insufficient

24

that trip. When the brother noted that "this is not something that you – you would normally do," Dr. Conklin replied that it was "a million to one" that the letter would ever matter. The brother later reminded Dr. Conklin about the letter after he returned to Missouri, and Dr. Conklin responded that he believed it was "over and done with." Dr. Conklin gave his other brother a similar description of the letter in conversation that occurred after Dr. Conklin returned from the Arizona trip.

The trial court also referenced extrinsic evidence showing that Dr. Conklin was greatly interested in – and had a detailed understanding of – his estate planning. He had been to at least one seminar and was actively involved in planning his estate both before and after his marriage to Mrs. Conklin. After 2002, he confided to his brother (an attorney) his concerns over Mrs. Conklin's money management abilities, as well as his decision that he could provide for her "without disturbing everything" simply by titling certain assets so they would pass to her outside of probate or his Trust. The trial court also noted, presumably based (at least in part) on the records of the probate proceeding not available to this Court, that Mrs. Conklin received more than one million dollars of non-probate transfers and insurance proceeds following Dr. Conklin's death.

On appeal, the Stepchildren insist that the trial court erred in admitting and relying on such extrinsic evidence because Missouri law prohibits the use of parol evidence in construing the terms of a trust. This claim is rejected. Extrinsic evidence was properly

---

evidence that Dr. Conklin intended any part of the 2002 Letter to amend the 1996 Trust, regardless of whether the "condition" of the Conklins' simultaneous deaths had been satisfied.

25

considered in this case to determine whether Dr. Conklin intended for the 2002 Letter to serve as an amendment to his Trust.

As a general proposition, extrinsic evidence will not be admitted to contradict terms of an express trust that are set forth in an unambiguous writing the settlor intends to be complete. *See First Nat'l Bank of Kansas City v. Hyde*, 363 S.W.2d 647, 653 (Mo. 1962) ("Where the language used is clear and of well-defined force and meaning, it must stand as written and extrinsic evidence of what was intended in fact cannot be adduced to qualify, explain, enlarge, or contradict the language."). This is sometimes referred to as the four corners rule, though it has its roots in the same policies that gave rise to the parol evidence rule that governs the use of extrinsic evidence in the construction of written contracts.

But, like the parol evidence rule, the four corners rule extends no further than the foregoing statement suggests. Extrinsic evidence may be admitted to explain and resolve ambiguous trust terms. *Kerens v. St. Louis Union Trust Co.*, 223 S.W. 625, 648 (Mo. banc 1920). The trial court concluded that the 2002 Letter was ambiguous as to Dr. Conklin's intent and received the evidence on that basis. This Court disagrees. As explained above, no fair reading of any word or phrase in the 2002 Letter (or of the letter as a whole) suggests that Dr. Conklin understood and intended for the letter to serve as an amendment to the Trust, or even creates an ambiguity about that issue.

But, even though the 2002 Letter is not ambiguous, extrinsic evidence is properly considered in determining whether Dr. Conklin intended for the letter to amend the Trust. The four corners rule only prohibits the use of extrinsic evidence to ***contradict*** the terms

26

of an final and unambiguous trust document, or to add new terms to such a document that the settlor intended was a complete recitation of the trust's terms. *First Nat'l Bank of Kansas City*, 363 S.W.2d at 653. It does not prohibit the use of extrinsic evidence to establish the settlor's intention regarding the nature or purpose of a document generally. *See Mercantile Trust Co.*, 298 S.W.2d at 390 (extrinsic evidence admitted to show settlor's letter not intended to amend trust even though letter was not ambiguous); *Platt v. Huegel*, 32 S.W.2d 605, 607, 608 (Mo. 1930) (decedent's out-of-court statements properly admitted to show whether transfer was intended to be absolute or in trust even though writings were not ambiguous). *See also Porreca v. Gaglione*, 265 N.E.2d 348, 350 (Mass. 1970) (extrinsic evidence is not barred "because the defendants attempt not to vary or contradict [the trust's] terms but, rather, to challenge its very existence"); *Otto v. Gore*, 45 A.3d 120, 131 (Del. 2012) ("parol evidence rule … does not preclude the use of extrinsic evidence to resolve the question of intent to create a final, enforceable trust"); William F. Fratcher, *Scott on Trusts* § 38 at 406–08 (4th ed. 1987) ("admission of the extrinsic evidence of an intention to create a trust does not vary the terms of the written instrument but only supplements it with respect to a matter as to which the instrument is silent").

Even though the four corners rule excludes extrinsic evidence to vary an unambiguous term *in* a trust document, it does not forbid using such evidence to establish whether the settlor actually intended a particular writing to *be* a trust document. "Extrinsic evidence may relate to whether the trust has been formed or to the meaning of the specific terms. The former use of extrinsic evidence is permitted; the latter is

prohibited where the trust language is clear and unambiguous." *Otto*, 45 A.3d at 131. Accordingly, this Court holds that the trial court did not err in considering extrinsic evidence on the question of whether Dr. Conklin intended for the 2002 Letter to amend the Trust.

The fact that the extrinsic evidence was properly admitted, however, does not mean that the trial court's legal conclusion that was based (in part) on such evidence must also be correct. No matter how credible the trial court may have found this extrinsic evidence to be, and no matter how much weight the trial court may have given it, it simply does not establish (alone or in conjunction with the language of the letter) that Dr. Conklin understood and intended for the 2002 Letter to serve as an amendment to his Trust.

Like the text of the 2002 Letter, the most that can be inferred from this extrinsic evidence is that Dr. Conklin knew the dispositions he "desired" to occur in the event he and Mrs. Conklin died simultaneously were inconsistent with the dispositions required by the terms of his Trust. Putting this evidence together with the text of the letter, therefore, merely reinforces the inference that Dr. Conklin "wished" his property to be disposed of according to the letter, not that he believed or intended the letter would legally require the Children to do so.

Of course, the language of the letter and the extrinsic evidence do not conclusively *exclude* other possibilities, including the possibility that Dr. Conklin intended the letter to be a legally binding amendment that would be effective upon his death. But possibilities are not evidence, and the Court holds that the Stepchildren failed to adduce clear and

28

convincing proof that Dr. Conklin did so intend. *Atl. Nat'l Bank of Jacksonville*, 211 S.W.2d at 5.[15]

Accordingly, after considering all of the intrinsic and extrinsic evidence, the Court holds that the Stepchildren failed to prove that Dr. Conklin intended the 2002 Letter to amend the Trust. The trial court was correct that the letter was written in anticipation of an event that did not occur, and that it requested the couple's children to arrange dispositions some of which were inconsistent with the terms of the Trust. But these factors do not compel the inference that Dr. Conklin intended for the 2002 Letter to serve as an amendment to the Trust, particularly in the absence of any other evidence suggesting that he understood and intended it would do so.

## B. Children's Fee Award for Defending this Suit was not Improper

The Stepchildren contend that the trial court erred in authorizing the Children, as trustees, to recover their fees and costs incurred in defending the Trust from the Trust property.[16] When a trial court awards a trustee's fees and expenses in an action against the trust, this Court reviews only for an abuse of discretion. *Reed v. Eagleton*, 384 S.W.2d 578, 590 (Mo. 1964). The Stepchildren contend that the fee award was an abuse

---

[15] George T. Bogert, *Trusts* §11, at 24 (6th ed. 1987) ("intent to have a trust must not only be formed in the mind of the settlor but must also be expressed by reducing his intent to writing or by communicating it to another") (citing *Bates v. Clark*, 163 S.W.2d 975 (Mo. 1942)).

[16] The trial court suggested this may be a pyrrhic victory because any recovery for the Children as trustees comes solely at the expense of the Children as beneficiaries. This may not be correct, however, as this payment may impact the interest of their descendants in the Trust remainder. As beneficiaries, the Children receive only the interest on their shares, plus whatever additional distributions they (as trustees) decide they require for their "health, maintenance, support and education." The remainder of each Child's share goes to that Child's descendants when she dies.

29

of discretion because the Children were acting in their own interests and not in the interest of the Trust.

The Stepchildren sued the Children, both as trustees and as individuals. As noted in the margin, the Children's actions in defending the Trust not only benefited themselves as beneficiaries, but they also benefitted the interests of the remainder beneficiaries as well (i.e., the Children's descendants upon the Children's deaths). Accordingly, the trial court did not err in determining that all of the Children's fees and expenses inured to the benefit of the Trust and should be payable from the Trust assets.

In addition, the trial court's award was based on section 456.10-1004, which provides: "In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid … from the trust that is the subject of the controversy." This statute does not limit awards only to trustees or others whose actions benefitted a trust. Though fee awards normally will be limited to such parties, the statute imposes no such limitation. Instead, it leaves the award to the trial court's determination of what "equity and justice" require. On that basis, too, this Court discerns no abuse of discretion on the part of the trial court.

### C. Children's Defense of this Suit did not Violate No-Contest Clause

In their last point, the Stepchildren claim that the trial court erred in finding that the Children did not violate the Trust's no-contest clause. They argue that, because the Children denied the validity of the 2002 writing as a valid amendment to the Trust and

30

defended this lawsuit seeking to establish the validity of that amendment, they have violated the "no-contest" provision of the Trust.

Even if the Stepchildren had succeeded in proving: (a) that the 2002 Letter was an amendment to the Trust; and (b) that this amendment went into effect and alters the terms of the Trust today, it is not clear that the Children would have violated the Trust's no-contest clause merely by resisting these assertions and insisting that the Stepchildren meet their burden of proof regarding them. That question need not be decided in this case, however.

The Stepchildren fell far short of carrying their burden to prove the existence and validity of the alleged amendment to the Trust under which they seek to recover. As a result, it was they – and not the Children – who acted against the validity of the Trust. Accordingly, the trial court did not err in holding that Children did not violate the Trust's no-contest provision by resisting the Stepchildren's claims and subsequent lawsuit.

## III. *Conclusion*

For the reasons stated above, the trial court's judgment in favor of the Children is affirmed.

_____
Paul C. Wilson

All concur.

31