In the ESTATE OF Loren Lowell
DEPEW, Deceased

Cheryl Reinagel and Roy Steven
Thomas, Petitioners-
Appellants,

v.

Loren Lloyd DePew, Jr., Respondent-
Respondent.

No. SD 34417

Missouri Court of Appeals,
Southern District,
Division One.

Filed: Feb. 21, 2017

MARK S. JOHNSON, CAPE GIRAR-DEAU, MO, for Appellants.

CHRISTINA L. KIME, PIEDMONT, MO, for Respondent.

DON E. BURRELL, J.

Cheryl Reinagel and Roy Steven Thomas, as co-personal representatives (collec-

tively, "Personal Representatives")[1] of the Estate of Loren Lowell DePew ("Father"), Deceased, appeal the judgment in their action against their step-sibling, Loren Lloyd DePew, Jr. ("Son"), to discover assets and for imposition of a constructive trust. The judgment awarded Personal Representatives $2,337.59 (a small portion of the amount sought), and it assessed costs to Personal Representatives.

Personal Representatives' first point claims the trial court erred in applying the law governing Son's fiduciary duty to Father when dealing with certain joint bank accounts ("the Joint Accounts"). Point 1 additionally claims that unspecified "findings of fact ... were against the manifest [sic] weight of the evidence[.]" Point 2 claims that granting Son a set-off for Father's funeral home expenses was against the weight of the evidence because Father's "funeral bill had already been paid with [Father's] own funds from the Joint Accounts." Point 3 claims that the trial court misapplied the law in denying Personal Representatives an award covering their court costs under Rule 77.01 and section 514.060.[2] Because the trial court reached the correct result, we affirm.

### Applicable Principles of Review and Governing Law

 When reviewing a court-tried case, we will affirm the trial court's judgment "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Ivie v. Smith*, 439 S.W.3d 189, 198-99 (Mo. banc 2014). "Circuit courts are free to believe any, all, or none of the evidence presented at trial[,]" *id.* at 200, and "we view the facts in the light most favorable to the judgment." *Estate of Hutchison v. Massood*, 494 S.W.3d 595, 598 n.2 (Mo. App. W.D. 2016). We review "questions of statutory interpretation *de novo*[,]" *Ivie*, 439 S.W.3d at 202, and we also apply *de novo* review to the interpretation of court rules. *McGuire v. Kenoma, LLC*, 447 S.W.3d 659, 662 (Mo. banc 2014).

When reviewing the record in an against-the-weight-of-the-evidence challenge, this Court defers to the circuit court's findings of fact when the factual issues are contested and when the facts as found by the circuit court depend on credibility determinations. A circuit court's judgment is against the weight of the evidence only if the circuit court could not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment. When the evidence poses two reasonable but different conclusions, appellate courts must defer to the circuit court's assessment of that evidence.

*Ivie*, 439 S.W.3d at 206 (citations omitted).

Finally, appellate courts are "primarily concerned with the correctness of the trial court's result, not the route taken by the trial court to reach that result." *Business Men's Assur. Co. of Am. v. Graham*, 984 S.W.2d 501, 506 (Mo. banc 1999). To that end, the judgment must be "affirmed if cognizable under any theory, regardless of whether the reasons advanced by the trial court are wrong or not sufficient." *American Eagle Waste Indus., LLC v. St. Louis County*, 379 S.W.3d 813, 829 (Mo. banc 2012).

*Rouner v. Wise*, 446 S.W.3d 242, 249 (Mo. banc 2014).

---

1. Personal Representatives are the step-children of Father. Their mother ("Mother") passed away in 2007.

2. All rule references are to Missouri Court Rules (2016). Except where otherwise noted, all statutory references are to RSMo 2000.

## Applicable Facts and Procedural Background

Father suffered a stroke that physically affected the left side of his body, and he began residing in a nursing home in July 2012. At that time, Father had a checking account and a savings account at one bank, and he had a savings account and some certificates of deposit ("CDs") at another bank (collectively, "the old accounts"). Via a power of attorney, Father had previously designated Ms. Reinagel as his attorney in fact.[3] Father had also previously executed a will that, due to Mother having predeceased him, had the effect of bequeathing one-half of his remaining estate to his five children and the other half to his four step-children.

After Father entered the nursing home, Son went to see Father "like every day[,]" and Son would sometimes bring Father home on the weekends to allow Father to visit his dog, Juno, a Great Pyrenees, that Son was taking care of. Ms. Reinagel did not visit the nursing home as often.

In November 2012, Father executed a durable power of attorney ("the POA") designating Son as his attorney in fact. The nursing home's social service coordinator, Belinda Ward, provided the POA form to Father, and she prepared the POA at her "own direction[.]" The POA revoked any other power of attorney previously signed by Father except any "directly related to [his] health care[.]" Among other things, the POA authorized Son to open and close bank accounts, "[c]onduct any business with any banking or financial institution with respect to any of [Father's] accounts," and to "[a]dd, delete or change beneficiaries to any financial accounts" that Father owned. The POA also provided that Son had the power to "[m]ake gifts from [Father's] assets to members of [Father's] family and to such other persons or charitable organizations with whom [Father has] an established pattern of giving (or if it is appropriate to make such gifts for estate planning and/or tax purposes)" ("the gift provision").

Later in November 2012, after the POA had been executed, a new checking and new savings account were opened in the name of both Father and Son ("the Joint Checking Account" and "the Joint Savings Account,") respectively. A deposit service representative for the bank, Nicky Proffer, testified that Father and Son came into the bank together "[t]o discuss how to open a new account; a joint account." Father was in a wheelchair. Ms. Proffer recalled that she spent about "35 to 45 minutes" with the men. Father appeared "[c]ompetent" at the time, "[Father] asked questions and gave answers," and Ms. Proffer did not see any problems with Father's communication. She said that she explained to Father and Son that "joint owner account[s]" would have "both parties' names on them, they have equal rights to the funds." She also explained that if one owner dies, then the account becomes "the other owner's."[4]

---

**3.** Section 404.703(1) defines an "[a]**ttorney in fact**" as "an individual or corporation appointed to act as [attorney in fact] of a principal in a written power of attorney[.]"

**4.** Neither party requested written findings on specified controverted material facts pursuant to Rule 73.01(c). Nonetheless, the trial court included factual findings in the judgment that might be seen as inconsistent with one another. Factual finding #10 states that "[Father] and [Son] opened [the Joint Accounts.]" Factual finding #24 states that "[Father] created the [Joint Accounts]." We need not resolve any such inconsistency because if we assume that Father and Son created the Joint Accounts, the finding *least* favorable to the judgment and most favorable to the arguments raised by Personal Representatives, Personal Representatives cannot prevail for the reasons set forth in this opinion. It is also important to note that Personal Representatives do not

The signature card for the Joint Checking Account identifies the account owners as Father and Son, it bears signatures for both, and the "OWNERSHIP OF ACCOUNT—CONSUMER PURPOSE" includes a box that is marked so as to designate the type ownership as "JOINT—WITH SURVIVORSHIP (AND NOT AS A TENANCY BY THE ENTIRETY OR AS TENANTS IN COMMON)[.]" The signature card for the Joint Savings Account also identifies Father and Son as the account owners, reflects the same designation as to the type of ownership, and shows signatures for both Father and Son.

The money from the old accounts was eventually transferred into the Joint Accounts, and the money in the Joint Accounts came "solely" from Father. Son testified that he thought the money in the Joint Accounts was to be used to take care of Father and Juno until Father died. After Father's death, Son thought it was to be used for Juno and as he "saw fit[.]" Son testified that Father was "always with" Son when money was deposited to the Joint Accounts. Father signed "instrument[s]" at the banks for the old accounts, but on one occasion in December 2012, Son removed $3,514.17 from one of the old accounts by signing a withdrawal check in his status as Father's attorney in fact under the POA. Son did this to close out the old account, and the funds were deposited into the Joint Checking Account. Son recalled that this was the only time he had signed one of Father's checks as Father's attorney in fact.

One of Father's other children, Jutta Ramirez ("Daughter"), testified that she lived in Texas, she saw Father at least twice a year, and she spoke with him daily by phone, both before and after he went into the nursing home. While he was in the nursing home, Father's "state of mind" seemed "[v]ery clear" and "[h]e understood what was going on." Father's monthly income was "[b]arely over $1,000[,]" and the nursing home cost $5,000 per month, so at some point Daughter discussed with her siblings that Father "needed to cash in CDs." Daughter also saw Father writing checks after the Joint Accounts had been opened.

Father passed away on February 4, 2014. That same day, Son wrote a check from the Joint Checking Account to the funeral home in the amount of $7,816.00. The next day, Son wrote a check to himself in the amount of $17,243.31 from the Joint Checking Account and withdrew $27,800.87 from the Joint Savings Account. Son deposited these funds—$45,044.18—into his own account ("Son's account").

Shortly thereafter, Son wrote a check from his own account in the amount of $8,076 to "redistribute that money" to the Joint Checking Account because there were three outstanding checks remaining after Son closed it. Son explained that "$7,000" of this was for Father's casket. Personal Representatives' Exhibit 22 is comprised of bank records for the Joint Checking Account, and it reflects an $8,076 deposit on February 5, 2014. By February 7, 2014, four checks had cleared from the Joint Checking Account, including Son's check for $17,243.31—leaving a balance of $92.50 in the Joint Checking Account after a $7.50 service charge had been deducted. The other checks represented payments of: $107.55 to a pharmacy (with a memo, "Juno"); $53.03 to a feed store (with a memo, "Juno"); and $7,816.00 to a funeral home (with a memo, "Dad"). In September

claim that Father was incompetent at the time the Joint Accounts were created or that they

were the product of undue influence by Son.

2015, Son put a total of $6,900—representing refunds from Father's nursing home and health care providers—into Son's account.

In November 2015, Personal Representatives filed their "**FIRST AMENDED PETITION FOR DISCOVERY OF ASSETS AND FOR CONSTRUCTIVE TRUST**" ("the petition"). Count 1 of the petition sought $45,044.18, plus interest from the date of Father's death, for the funds Son transferred to Son's account the day after Father's death. Count 2 sought the imposition of a constructive trust on Son's account having a balance of $40,628.44, plus any accrued interest. The petition alleged, among other things, that Son "established" the Joint Accounts with Father "as co-owners[.]" Son admitted these allegations in his answer to the petition.[5] Son also admitted that he owed Father "a fiduciary duty" under the POA.

The trial court took the matter under advisement at the end of the December 2015 trial and permitted the parties an "opportunity to brief the legal issues[.]" The trial court entered its judgment in March 2016. The judgment incorporated findings of fact and conclusions of law, including, *inter alia*, that Father "was competent at all times up to two (2) days before his death."

Concerning the Joint Accounts, the judgment finds both that Father and Son "opened" the Joint Accounts and "that [Father] created the ... [J]oint [A]ccounts." The judgment finds that Father "was always present when funds were transferred into the ... [J]oint [A]ccounts[,]" but it then finds that Son's transfer of $3,514.17 from one of the old accounts was an exception to Father's presence, intent, and authorization to transfer money into one of the Joint Accounts. As to that one occasion, the judgment finds that Son was acting "in his fiduciary capacity[.]"

The judgment also finds that Son transferred a total of $45,044.18 from the Joint Accounts to Son's account on the day after Father's death; Son subsequently "paid a funeral expense of $8,076.58" from Son's account; and Son "offered no explanation as to why he deposited the sum of $6,900.00 into [Son's account] on September 1, 2015."

■ Based upon these factual findings, the judgment grants a monetary award in favor of Personal Representatives in the amount of $2,337.59 (with costs assessed to Personal Representatives) in accordance with the following calculation.[6]

5. Personal Representatives' statement of facts maintains that Son "admitted that he was *the one* who established these Joint Accounts with [Father's] money." (Emphasis added.) However, the petition does not allege that Son established the Joint Accounts by himself or that Father was not involved. Further, the allegations cited from the petition do not specify whether Son was acting in his personal capacity or as Father's attorney in fact when creating the Joint Accounts. Personal Representatives' Point 1, and the argument supporting it, assert that Son "participated in the creation of the Joint Accounts[.]" In making their against-the-weight-of-the-evidence argument, Personal Representatives challenge "[t]he trial court's finding that it was only [Father] who established the Joint Ac-

counts[.]" Personal Representatives do not appear to claim that Father was not involved in the creation of the Joint Accounts.

6. The judgment acknowledges that Personal Representatives' claim for a constructive trust was a part of the petition tried to the trial court, but it otherwise makes no express ruling regarding a constructive trust, and it makes no ruling that explicitly ties the relief granted to either Count 1 or Count 2. Nonetheless, we regard the judgment as final for purposes of appeal, *see* Rule 74.01(b), because it found the amount in favor of Personal Representatives to be $2,337.59, and it also stated that "[Son] is ordered to pay said sum over to [Personal Representatives]." By ordering Son to pay the entire judgment amount himself to

$3,514.17—December 11, [2012], deposit into [the J]oint [C]hecking [A]ccount

plus $6,900.00—[the] nursing home refunds

less $8,076.58—funeral home expense paid by [Son].

This appeal timely followed.

## Analysis

### Point 1—Son's Fiduciary Duty

Point 1 makes two contentions: (1) "the trial court erroneously declared and applied the law of [Son's] fiduciary responsibility to [ (2) ] findings of fact that were against the manifest weight of the evidence[.]"[7]

In contending that the trial court erred regarding "the law of [Son's] fiduciary responsibility[,]" Personal Representatives argue that Son could not have been both Father's attorney in fact and a participant in the Joint Accounts, which included "rights of survivorship, without violating [Son's] fiduciary duty." In making this argument, Personal Representatives rely on two sections of the Durable Power of At-

torney Law of Missouri, ("the MDPOA") see section 404.700 to 404.735, specifically sections 404.714.1 and 404.712.1.

Section 404.712.1 provides:

An attorney in fact acting for the principal under a power of attorney shall clearly indicate his capacity and shall keep the principal's property and accounts separate and distinct from all other property and accounts in a manner to identify the property and accounts clearly as belonging to the principal.

Section 404.714.1 provides, *inter alia*:

An attorney in fact who elects to act under a power of attorney is under a duty to act in the interest of the principal and to avoid conflicts of interest that impair the ability of the attorney in fact so to act. A person who is appointed an attorney in fact under a power of attorney, either durable or not durable, who undertakes to exercise the authority conferred in the power of attorney, has a fiduciary obligation to exercise the powers conferred in the best interests of the principal, and to avoid self-dealing and conflicts of interest, as in the case of a

---

Personal Representatives, the judgment implicitly denied a constructive trust as to Son's account. "If a judgment, by implication, necessarily carries with it a finding upon other counts, the judgment will be sustained as final even though the count is not specifically mentioned." *Jefferson v. Am. Fin. Grp., Inc.*, 163 S.W.3d 485, 487 n.2 (Mo. App. E.D. 2005).

**7.** The second portion of this claim is not preserved for our review. A challenge to the trial court's factual findings must be set forth in a separate point from one that challenges the trial court's application of the law. *Ivie*, 439 S.W.3d at 199 n.11. Further, the point asserts that Son "participated in the creation of the Joint Accounts and ... he subsequently made deposits of [Father's] money into the Joint Accounts[,]" but it does not identify what factual finding the trial court made that was against the weight of the evidence, Rule 84.04(d)(A), nor does it explain why such an

erroneous factual finding would, "in the context of the case, ... support the claim of reversible error." Rule 84.04(d)(C). *Cf. Green v. Green*, 445 S.W.3d 642, 647 (Mo. App. E.D. 2014) (the point relied on did not explain "how the trial court erred or why the law, in the context of the facts, supports [the] claim of reversible error"). Moreover, to the extent that the argument supporting the point identifies "two crucial findings of fact by the trial court that were used to support its decision [that] Father " 'created the [Joint Accounts,]' " and Father " 'was present, intended to make, and authorized the transfers into the [Joint Accounts,]' " it does not follow the "distinct analytical framework" required to make a proper against-the-weight-of-the-evidence challenge. *See Houston v. Crider*, 317 S.W.3d 178, 186-87 (Mo. App. S.D. 2010) (setting out the "four sequential steps" for an against-the-weight challenge).

trustee with respect to the trustee's beneficiary or beneficiaries; and in the absence of explicit authorization, the attorney in fact shall exercise a high degree of care in maintaining, without modification, any estate plan which the principal may have in place, including, but not limited to, arrangements made by the principal for disposition of assets at death through beneficiary designations, ownership by joint tenancy or tenancy by the entirety, trust arrangements or by will or codicil.[8]

Thus, the sections cited by Personal Representatives impose specific obligations on Son when acting as Father's attorney in fact under the POA. But another provision of the MDPOA—section 404.710.6—additionally addresses an attorney in fact's powers, and its subparagraph (3) permits an attorney in fact "[t]o make or revoke a gift of the principal's property in trust or otherwise" provided that such "actions are expressly authorized in the power of attorney." *See also Estate of Lambur*, 397 S.W.3d 54, 64 (Mo. App. S.D. 2013) ("[u]nder Missouri law, an attorney in fact is prohibited from making a gift of the principal's property to the attorney in fact, unless expressly authorized to do so in the power of attorney").

Personal Representatives quote a passage from *Estate of Herbert v. Herbert*, 152 S.W.3d 340, 353 (Mo. App. W.D. 2004), that references the limitations imposed by section 404.710.6(3), but they offer no analysis of the applicability of that section to the facts of this case. Instead, they note that Son's "authority to make gifts to him-

self . . . was not raised in the trial court." That statement is true, but it does not support Personal Representatives' claim of reversible error. Even if a gift authorized by Father in the POA was not the basis for the trial court's decision, the judgment may still be affirmed on this ground if, indeed, it supports the judgment. *See Rouner*, 446 S.W.3d at 249. Personal Representatives attempt to foreclose consideration of this mechanism by arguing that "[i]n any event, the [POA] contained no provision authorizing [Son] to make gifts to himself[.]" This overlooks the express language of the gift provision as Son was expressly authorized to "[m]ake gifts from [Father's] assets to members of [Father's] family[.]"

Personal Representatives rely on three cases in arguing that Son "cannot be an attorney in fact for [Father] and at the same time participate in the creation of the Joint Accounts in which he is a joint owner, with rights of survivorship, without violating his fiduciary duty": *Lambur*, 397 S.W.3d at 54, *Bridges v. White*, 223 S.W.3d 195 (Mo. App. S.D. 2007), and *Herbert*, 152 S.W.3d at 340. These cases do not require us to find that the trial court erred as a matter of law in effectively finding that Son could retain the balance of the Joint Accounts [9] because they do not address the same written gift authorization contained in the POA.

The *Lambur* opinion affirmed summary judgment against one attorney in fact and reversed as to that attorney in fact's husband where the power of attorney permit-

---

**8.** RSMo Cum. Supp. 2013. Personal Representatives do not contend in Point 1 or the argument supporting it that the POA expressly authorized Son to exercise some other degree or no degree of care regarding the maintenance of Father's estate plan, including Father's participation in the Joint Accounts.

**9.** Because Son does not appeal the judgment's offsets for the check he wrote as attorney in fact and the refund of the nursing home funds, we do not address any issues related to those rulings.

ted a gift to the principal's attorney in fact "that [would] not exceed in any year the annual gift tax exclusion[.]" 397 S.W.3d at 57. The gift tax exclusion for the relevant year "was $11,000." *Id.* Acting under the power of attorney, the attorney in fact deposited money from the principal's accounts and certificates of deposit into accounts in the names of the principal and attorney in fact " 'with Right of Survivorship.' " *Id.* After the principal's death, one attorney in fact closed the accounts, collected over $100,000 from them, and spent "the money on various personal items and debts." *Id.* at 57-58. "The issue [was] not [the attorney in fact's] authority to open the joint bank accounts, or even the use of the funds in the joint bank accounts during [the principal's] lifetime. Rather, the issue is the right of possession of the proceeds from the joint accounts upon [the principal's] death; i.e., the right-of-survivorship language on the joint accounts." *Id.* at 63. Our reasoning on the matter was that "[p]owers of attorney are to be strictly construed[,]" and the only paragraph authorizing a gift to the attorney in fact limited the gifts in "any year" to the amount of the annual gift tax exclusion. *Id.* at 64-65. "Therefore, [the attorney in fact] violated the fiduciary duty she owed to [the principal] when she withdrew funds totaling more than the annual gift tax of $11,000." *Id.* at 65.[10]

In *Herbert*, the power of attorney executed by the principal contained a provision permitting the attorney in fact (who was also the principal's son) to make gifts of the principal's property to family members, but it also expressly provided that the attorney in fact "may not make gifts of [the principal's] property to himself." 152 S.W.3d at 342 and 346. A "joint bank account, with right of survivorship, was opened . . . in the names of the [principal] and [attorney in fact]" that eventually became the subject of appellants' action to discover assets. *Id.* at 343. The attorney in fact sold the principal's farm and some personal property. The attorney in fact then endorsed checks for the proceeds as the principal's attorney in fact before depositing them into the subject account. *Id.* at 343 and 351. The principal later died, leaving a balance in the subject account, and the attorney in fact claimed that title to the balance had "passed to him as the sole surviving party to the account." *Id.* at 343 and 345.

On review, the western district of our court reasoned that because there was no dispute that the proceeds from these sales were the principal's to begin with, then the attorney in fact had to show that he "was authorized by the [principal] to make the deposits of the sale proceeds to the [subject] account, so as to pass title of the proceeds to the [subject] account[.]" *Id.* at 351. They rejected the attorney in fact's argument that oral directions from the principal to deposit the checks into the subject account "countermanded" the "express prohibition of" his power of attorney to make gifts to himself. *Id.* at 351 and 354. As a result, "as a matter of law, the title of the sale proceeds never passed to the joint account so as to make them subject to the presumption of joint tenancy with a right of survivorship[.]" *Id.* at 354.

---

10. In reaching this conclusion, the Western District noted that they did

> not intend . . . th[e] opinion to be interpreted as finding joint accounts cannot be opened with the principal and attorney-in-fact. We recognize this is a common practice and may be necessary to fulfill the purpose of a power of attorney. The issue in this case is the effect of the right-of-survivorship language on the joint account causing the account to become a gift to the attorney-in-fact.

*Id.* at n.15.

The *Bridges* decision does not add anything new to *Herbert* that would be dispositive in the instant case. In *Bridges*, the principal bought two certificates of deposit that designated the respondent as the beneficiary upon the principal's death. 223 S.W.3d at 197. The principal's attorney in fact subsequently withdrew the money tied to the certificates of deposit ("the funds") and put the funds into an account that she shared with the principal as "joint tenant with right of survivorship" ("the shared account"). *Id.* The principal subsequently died, the trial court granted the respondent's motion for summary judgment regarding his claim to the funds, and we reversed because a fact question remained regarding the attorney in fact's purpose in depositing the funds into the shared account. *Id.* at 197 and 200.

The respondent in *Bridges* did argue that the attorney in fact's "actions constituted making a gift to herself because she placed the funds in the [shared] account[,]" *id.* at 199, and, citing *Herbert*, we stated that "[i]f an attorney-in-fact deposits proceeds from a sale into a joint bank account in which the attorney-in-fact had a right of survivorship, it is a gift to himself." *Id.* at 199. Indeed, the opinion generally "agree[d] that a fiduciary under a power of attorney may not create a gift to himself by depositing funds into a joint account; however, the salient question before us [was] whether [the attorney in fact] had the right to initially withdraw the funds." *Id.* Despite the respondent's gift argument, the "right" claimed by the attorney in fact in that case was not that the funds were a gift. *Id.* at 197-98. Rather, the attorney in fact's affidavit before the trial court indicated that the attorney in fact

made changes in the accounts to prepare for the principal's extended care. *Id.* at 197-98. As a result, there is no analysis of section 404.710.6(3) in the opinion.

It is correct that *Bridges* and *Lambur* teach that when an attorney in fact deposits the principal's money in a bank account jointly owned with the attorney in fact, and the attorney in fact has a right of survivorship concerning the account, the attorney in fact has made a gift to himself. 397 S.W.3d at 65-66; 223 S.W.3d at 199. But this does not mean that Son's participation with Father in establishing the Joint Accounts with rights of survivorship and taking Father to banks to facilitate such deposits *necessarily* violates Son's fiduciary duty regarding unauthorized gifts. "Oftentimes, our opinions involving a written power of attorney are determined by the specific facts and conduct of the parties within the individual case. Therefore, the analysis in a fact-specific case may not apply generally to all cases involving a power of attorney." *Lambur*, 397 S.W.3d at 63. That is the case here, where the facts specific to this case include a written authorization for the attorney in fact (the principal's son) to make gifts to the principal's family members—a class that included Son. Point 1 is denied.

*Point 2—Son's Reimbursement*

■ Personal Representatives claim it was against the weight of the evidence for the trial court to grant Son "a set off of $8,076.58 for the reimbursement of [Father's] funeral expenses because … [Father's] funeral bill had already been paid with [Father's] own funds from the Joint Accounts."[11] Personal Representatives cite

11. In their argument supporting Point 2, Personal Representatives toss in additional contentions that Son did not plead "in his Answer to [the Petition] any right of setoff" and Son "should have submitted a claim to the estate for [Father's] funeral expenses." Because they are not included in a point relied on, these contentions are not preserved for our review. *Cordes v. Williams*, 201 S.W.3d 122, 129 (Mo. App. W.D. 2006).

no legal authority for this claim, and they do not engage in the analysis necessary to mount a proper against-the-weight-of-the evidence challenge. *See Houston*, 317 S.W.3d at 187. For instance, they do not address Son's testimony that he made a payment to the funeral home the day Father died from the Joint Checking Account, but he had to "redistribute" $8,076 back to that account from what was moved to Son's account following Father's death because there were three checks outstanding when he closed the Joint Checking Account. Son testified that "$7,000" of this was for Father's casket, and the exhibits reflect checks for $107.55 to a pharmacy and $53.03 to a feed store for Father's dog, Juno, along with $7,816.00 to the funeral home for Father. The failure to address "material favorable evidence from the weighing process strips [Personal Representatives'] purported demonstration of [error] of any analytical value or persuasiveness." *Id.* at 189. Point 2 is denied.

### Point 3—Assessment of Costs

In their final point, Personal Representatives claim that Rule 77.01 and section 514.060 required the trial court to assess costs against Son because Personal Representatives "were the prevailing party." They argue that the trial court abused its discretion in assessing costs to Personal Representatives because even with a judgment in their favor "for only $2,337.59, [Personal Representatives] were still the prevailing party and thus entitled to receive their costs of suit." We disagree.

"Awarding costs and expenses is within the sound discretion of the trial court and should not be reversed absent a showing that the trial court abused its discretion." *Trimble v. Pracna*, 167 S.W.3d 706, 716 (Mo. banc 2005). Rule 77.01 provides: "In civil actions, the party prevailing shall recover his costs against the other party, unless otherwise provided in these rules or by law." Section 514.060 provides: "In all civil actions, or proceedings of any kind, the party prevailing shall recover his costs against the other party, except in those cases in which a different provision is made by law." Just such a provision is contained in section 514.090, which provides: "Where there are several counts in any petition, and any one of them be adjudged insufficient, or a verdict, or any issue joined thereon, shall be found for the defendant, costs shall be awarded at the discretion of the court." "This statute affords the trial court discretion to apportion an award of costs in favor of a defendant who prevails on some but not all claims asserted by a plaintiff." *Riggs v. State Dep't of Soc. Services*, 473 S.W.3d 177, 183 (Mo. App. W.D. 2015).

Personal Representatives obtained a judgment of $2,337.59 on Count 1—a count that sought $45,044.18, plus interest. Personal Representatives did not prevail on their Count 2 claim seeking the imposition of a constructive trust. Based on these outcomes, we cannot say that the trial court abused its discretion in awarding costs as set forth in the judgment.

Point 3 is also denied, and the judgment of the trial court is affirmed.

JEFFREY W. BATES, P.J.—CONCURS

MARY W. SHEFFIELD, C.J.—CONCURS