Mary SN DOE, Appellant,

v.

**ROMAN CATHOLIC ARCHDIOCESE OF ST. LOUIS, an unincorporated association, and Archbishop Raymond Burke, of the Archdiocese of St. Louis, MO, Respondents.**

**No. ED 93007.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Feb. 23, 2010.

Application for Transfer to Supreme Court Denied March 29, 2010.

Application for Transfer Denied
June 29, 2010.

Marci A. Hamilton, Washington Crossing, PA, Patrick W. Noaker, Jeff Anderson & Associates, St. Paul, MN, Kenneth M. Chackes, M. Susan Carlson, Chackes, Carlson & Spritzer, LLP, St. Louis, MO, Rebecca M. Randles, Randles, Mata & Brown Kansas City, MO, for Appellant.

Edward M. Goldenhersh, Bernard C. Huger, Robert L. Duckels, Kirsten M. Ahmad, Greensfelder, Hemker & Gale, P.C., St. Louis, MO, for Respondents.

KURT S. ODENWALD, Presiding Judge.

### Introduction

Plaintiff Mary SN Doe (Appellant) appeals the trial court's dismissal of certain negligence-based claims contained in her action filed against the Roman Catholic Archdiocese of St. Louis (Archdiocese) and Archbishop Raymond Burke (Archbishop). We affirm the trial court's dismissal.

### Facts and Procedural Background

Appellant alleges she was sexually abused by Father William Poepperling

when she was approximately four to six years of age in the late 1950s. Appellant attended Holy Guardian Angels Church in St. Louis, Missouri, where Father Poepperling served. Fr. Poepperling died on May 18, 1983.

Appellant filed this suit against the Archdiocese and Archbishop (Respondents) on April 26, 2005, and filed an Amended Petition on January 29, 2008. Appellant alleged six counts: (I) Child Sexual Abuse and/or Battery; (II) Breach of Fiduciary Duty; (III) Negligence; (IV) Negligent Supervision, Retention, and Failure to Warn; (V) Intentional Failure to Supervise Clergy; and (VI) Negligent Supervision of Children.

As to counts III, IV, and VI (hereinafter referred to as "negligence-based counts"), Appellant alleged that Fr. Poepperling "was under the direct supervision, employ and control of" Respondents, and that "[a]ll acts of sexual abuse ... took place during functions in which Fr. Poepperling had custody or control of [Appellant] in his role as a priest and authority figure." Appellant alleged that Respondents "reasonably should have known of Fr. Poepperling's dangerous and exploitive propensities." Appellant alleged that, despite such knowledge, Respondents failed to: (1) protect her from Fr. Poepperling's sexual abuse; (2) remove Fr. Poepperling; (3) supervise Fr. Poepperling in his position of trust and authority as a Roman Catholic priest; or (4) provide adequate warning to her and her family of Fr. Poepperling's dangerous proclivities.

On February 8, 2008, Respondents filed a Motion to Dismiss Counts I, II, III, IV, and VI. On May 23, the trial court entered

an order granting Respondents' motion and dismissing each of those counts.

On September 12, 2008, Respondents filed a Motion for Summary Judgment with respect to Count V. On April 10, 2009, the trial court entered an order and judgment granting Respondents summary judgment on Count V, and subsequently entered final judgment as to all six counts contained in Appellant's Amended Petition.

Appellant appeals to this Court only the trial court's dismissal of Counts III, IV, and VI, the negligence-based counts.[1]

### Trial Court's Dismissal of Negligence–Based Counts

In dismissing Appellant's pure negligence claim (Count III) and negligent supervision of children claim (Count VI), the trial court, relying on *Gibson v. Brewer*, 952 S.W.2d 239 (Mo. banc 1997), explained that " [i]n order to determine how a 'reasonably prudent Archdiocese' would act, a court would have to excessively entangle itself in religious doctrine, policy, and administration." (internal citation omitted). Thus, the trial court concluded that a "claim of negligence can not [sic] be maintained against [Respondents] as it violates the First Amendment."

In dismissing Appellant's claim for negligent supervision, retention, and failure to warn (Count IV), the trial court again relied upon *Gibson* for its findings. The trial court separately addressed Appellant's negligent supervision, negligent retention, and negligent failure to warn allegations. As to Appellant's negligent supervision allegation, the trial court found that "adjudicating the reasonable-

---

ness of a church's supervision of a cleric requires inquiry into religious doctrine that is prohibited by the First Amendment to the U.S. Constitution." As to her negligent retention allegation, the trial court found that "questions of hiring, ordaining, and retaining clergy 'necessarily involve interpretation of religious doctrine, policy, and administration' that has the effect of inhibiting religion in violation of the First Amendment." (internal citation omitted). As to her negligent failure to warn allegation, the trial court found that "[i]n order to determine whether [Respondents] owed [Appellant] a duty to warn, a court would have to excessively entangle itself in religious doctrine, policy, and administration." Thus, the trial court concluded that "[t]he claims in Count IV must be dismissed."

### Point on Appeal

In her sole point on appeal, Appellant contends that the trial court erred in dismissing her three negligence-based counts pursuant to the Missouri Supreme Court's decision in *Gibson* because *Gibson* fails to comport with United States Supreme Court precedent.

### Preservation of Issue for Appeal

 An issue that was never presented to or decided by the trial court is not preserved for appellate review. *State ex rel. Nixon v. Am. Tobacco Co., Inc.*, 34 S.W.3d 122, 129 (Mo. banc 2000); Rule 84.13(a).[2]

Respondents characterize Appellant's point on appeal as an invocation of Supremacy Clause principles, which undermine the trial court's reliance on *Gibson*. Respondents further argue that Appellant has raised her Supremacy Clause argument for the first time on appeal, and

therefore, has not preserved this argument for appeal. We note that Appellant did not expressly refer to the Supremacy Clause, or the general principle that the United States Supreme Court provides the ultimate authority on interpretations of federal constitutional law in its pleadings filed with the trial court. However, Appellant's Response to Respondents' Motion to Dismiss posited that the Missouri Supreme Court in *Gibson* "mishandled the overall First Amendment issues." In so asserting, Appellant carefully examined United States Supreme Court jurisprudence regarding the Free Exercise Clause, the Establishment Clause, and judicial abstention in intra-church disputes. Therefore, we conclude that Appellant sufficiently presented her argument to the trial court, and has preserved her Supremacy Clause challenge to the trial court's dismissal of the negligence-based counts.

### Standard of Review

An appellate court reviews a trial court's grant of a motion to dismiss de novo. *Moynihan v. Gunn*, 204 S.W.3d 230, 232–33 (Mo.App. E.D.2006). When reviewing the dismissal of a petition for failure to state a claim, appellate courts treat the facts contained in the petition as true and construe them liberally in favor of the plaintiffs. *Id.* at 233.

### Discussion

I. *Gibson v. Brewer*

In *Gibson*, a plaintiff alleged that a member of a diocese's clergy sexually abused him. The defendant-diocese contested the plaintiff's allegations of (1) negligent hiring/retention of clergy, (2) negligent supervision of clergy, and (3) pure negligence. *Gibson*, 952 S.W.2d at 246–50. The Supreme Court of Missouri held that

**2.** All references are to Mo. R. Civ. P.2008, unless otherwise indicated.

the United States Constitution's Free Exercise and Establishment Clauses in the First Amendment[3] commanded dismissal of such negligence-based claims against religious institutions. *Id.* In so holding, *Gibson* analyzed United States Supreme Court precedent and reasoned that:

> Religious organizations are not immune from civil liability for the acts of their clergy. If neutral principles of law can be applied without determining questions of religious doctrine, polity, and practice, then a court may impose liability. *Id.* at 246 (internal citations omitted).

> Questions of hiring, ordaining, and retaining clergy, however, necessarily involve interpretations of religious doctrine, policy and administration. Such excessive entanglement between church and state has the effect of inhibiting religion, in violation of the First Amendment. *Id.* at 246–47 (internal citations omitted).

> By the same token, judicial inquiry into hiring, ordaining, and retaining clergy would result in an endorsement of religion, by approving one model for church hiring, ordination, and retention of clergy. A church's freedom to select clergy is protected 'as a part of the free exercise of religion against state interference.' Ordination of a priest is a 'quintessentially religious' matter, 'whose resolution the First Amendment commits exclusively to the highest ecclesiastical tribunals of this hierarchical church.' *Id.* at 247 (internal citations omitted).

> Adjudicating the reasonableness of a church's supervision of a cleric—what the church 'should know'—requires inquiry into religious doctrine.... [T]his would create an excessive entanglement,

inhibit religion, and result in the endorsement of one model of supervision. *Id.* at 248 (internal citations omitted).

## II. Merits of Appeal

As mentioned above, Appellant in this case implores us, an intermediate appellate court in the State of Missouri, to disregard clearly established precedent from the Missouri Supreme Court and permit her the opportunity to sustain a negligence action inquiring into whether Respondents "took due care in dealing with an employee who has access to children." Appellant argues that *Gibson*'s conclusion, which grants immunity to religious organizations for certain negligence claims, mishandled the First Amendment issue and ignored United States Supreme Court precedent. In addressing the merits of this appeal, our discussion begins and ends with the constraints of our judicial authority vested by the Missouri Constitution.

■ Missouri's Constitution expressly states that the Missouri Supreme Court "shall be the highest court in the state" and that its "decisions shall be controlling in all other courts." Mo. Const. art. V, Section 2. As such, we are "constitutionally bound to follow the most recent controlling decision of the Missouri Supreme Court," and inquiries questioning the correctness of such a decision are improper. *Independence–Nat. Educ. Ass'n v. Independence Sch. Dist.*, 162 S.W.3d 18, 21 (Mo.App. W.D.2005) (holding a "claim that the Missouri Supreme Court has incorrectly decided a previous case or cases is not cognizable in the Missouri Court of Appeals"); *Noe v. Pipe Works, Inc.*, 874 S.W.2d 502, 504 (Mo.App. E.D.1994) ("[W]e are constitutionally without authority to overrule the

---

**3.** The *Gibson* Court expressly acknowledged that "this Court does not address the applica-bility, if any, of the Missouri Constitution to this case." *Gibson*, 952 S.W.2d at 246.

controlling decisions of the Supreme Court.").

■ Though meriting our respect, decisions of the federal district and intermediate appellate courts and decisions of other state courts are not binding on us. *State v. Mack*, 66 S.W.3d 706, 710 (Mo. banc 2002) (holding "general declarations of law made by lower federal courts do not bind this Court"); *Craft v. Philip Morris Co., Inc.*, 190 S.W.3d 368, 380 (Mo.App. E.D.2005) (holding that "[o]ut-of-state appellate decisions do not constitute controlling precedent in Missouri courts"). Decisions of the United States Supreme Court on matters of federal law, however, bind all state courts. *See Chesapeake & Ohio Ry. Co. v. Martin*, 283 U.S. 209, 221, 51 S.Ct. 453, 75 L.Ed. 983 (1931) (holding that United States Supreme Court determinations of federal questions bind all state courts and must be followed notwithstanding any contrary state decision); *see Kraus v. Bd. of Educ. of City of Jennings*, 492 S.W.2d 783, 784–85 (Mo.1973) ("State court judges in Missouri are bound by the

'supreme law of the land,' as declared by the Supreme Court of the United States.") (internal citation omitted).

■■ Thus, a Missouri Supreme Court interpretation of federal constitutional law constitutes the controlling law within our state until either the Missouri Supreme Court or the United States Supreme Court declares otherwise. *See Martin*, 283 U.S. at 221, 51 S.Ct. 453.[4] While some authority suggests that an intermediate state appellate court should not follow decisions of its state supreme court when those decisions plainly conflict with those of the United States Supreme Court on a federal question,[5] such suggestion is inconsequential to our review as our examination of United States Supreme Court precedent reveals no decision either directly questioning *Gibson*'s reasoning nor contradicting its holding; nor can we conclude that *Gibson* plainly conflicts with a controlling decision of the United States Supreme Court. Though numerous federal courts[6] and out-of-state courts[7] diverge on the

---

4. *State v. Ward*, 231 Wis.2d 723, 604 N.W.2d 517, 525 (2000) ("Our decisions interpreting the United States Constitution are binding law in Wisconsin until this court or the United States Supreme Court declares a different opinion or rule."); 21 C.J.S. § 216 (2006).

5. An annotation to Art. 5, Section 2 of the Missouri Constitution provides a citation to *State ex rel. Mason v. Springfield African Soc. & Improvement Club*, 169 Mo.App. 137, 154 S.W. 458, 458–62 (1913) for this proposition. *See also* 21 C.J.S. § 216 (2006).

6. The United States District Court for the Eastern District of Missouri has addressed the same issue as *Gibson*—whether the First Amendment bars negligence actions against a religious institution for failing to supervise its sexually abusive clerics. In several instances, this federal district court held that because *Gibson* circumscribed Missouri's negligence law pursuant to the federal constitution, it had a duty to conduct its own constitutional determination. In so doing, at least two deci-

sions clearly held, contrary to *Gibson*, that the religion clauses in the First Amendment do not bar state claims of negligent hiring, retention, and supervision against a religious institution. *Perry v. Johnston*, 654 F.Supp.2d 996, 1003 (E.D.Mo.2009); *John Doe CS v. Capuchin Franciscan Friars*, 520 F.Supp.2d 1124, 1137 (E.D.Mo.2007).

7. Among the cases aligned with *Gibson*, decisions by the supreme courts of Maine and Wisconsin provide insight into the rationale for concluding that First Amendment considerations bar certain negligence claims against a religious institution. *See Swanson v. Roman Catholic Bishop of Portland*, 692 A.2d 441, 445 (Me.1997) (acknowledging that because a plaintiff's attack on the reasonableness of a church's mercy towards a sexually abusive cleric may hinge on beliefs in penance, admonition and reconciliation as a sacramental response to sin, "[clerics] cannot be treated in the law as though they were common law employees" and it would be "uncon-

issue of whether the religion clauses in the First Amendment bar plaintiffs from asserting certain negligence claims against religious institutions, those decisions do not authoritatively direct us to revisit a First Amendment analysis already conducted by the Supreme Court of Missouri. Such decisions merely inform us that reasonable courts disagree as to the application of First Amendment law to the facts at bar. Appellant devoted a considerable portion of her brief citing and summarizing the numerous lower federal court decisions and state court decisions supporting her underlying premise that the First Amendment does not prevent her causes of action for negligence. However, Appellant cites no United States Supreme Court case supporting her position, and cites no binding precedent that allows us to ignore the Missouri Supreme Court's holding in *Gibson.* Simply stated, the *Gibson* Court held that the First Amendment barred the assertion of tort claims against a religious institution based on its alleged negligence in supervising/retaining/hiring sexually abusive clerics. *Gibson,* 952 S.W.2d at 246–50. Until the Missouri Supreme Court or the United States Supreme Court declares differently, *Gibson* constitutes controlling law in Missouri, law which we are bound to apply. As such, the trial court did not err in relying on *Gibson* to dismiss Appellant's negligence-based counts as a matter of law.

### Conclusion

The trial court's judgment is affirmed as it properly applied *Gibson,* a controlling decision of the Missouri Supreme Court.

GEORGE W. DRAPER III, and GARY M. GAERTNER, JR., JJ., Concur.

stitutional ... to determine ... that the ecclesiastical authorities negligently supervised or retained [them]"); *L.L.N. v. Clauder,* 209 Wis.2d 674, 563 N.W.2d 434, 441 (1997) (acknowledging that "due to [a] strong belief in redemption, a bishop may determine that a wayward priest can be sufficiently reprimanded through counseling and prayer" and judicial review of whether the bishop should have taken some other action "would directly entangle [the court] in the religious doctrines of faith, responsibility, and obedience").

Among the cases opposed to *Gibson,* decisions by the supreme courts of Mississippi, Florida, and Colorado explain why the First Amendment poses no bar to negligence claims stemming from a sexually abusive cleric. *See Roman Catholic Diocese of Jackson v. Morrison,* 905 So.2d 1213, 1237 (Miss.2005)

(holding that "the cloak of religion ... cannot serve to shield [religious] institutions from civil responsibility for ... sexual molestation of a child" and "[n]or should it shield those who fail in their duty to protect children from it"); *Malicki v. Doe,* 814 So.2d 347, 364 (Fla. 2002) (emphasizing that because the core inquiry in determining whether a church-defendant should have foreseen the risk of harm to third parties was a "neutral principle of tort law," it did not "foresee 'excessive' entanglement in internal church matters or in interpretation of religious doctrine or ecclesiastical law"); *Moses v. Diocese of Colo.,* 863 P.2d 310, 319–21 (Colo.1993) (holding that the First Amendment did not a preclude negligent hiring claim where a diocese knew of priest's problems of depression and struggles with sexual identity).