

# In the
# Missouri Court of Appeals
# Western District

R.M.A., )
)
    Appellant, )
)    **WD85778**
    v. )    **OPINION FILED:**
)    **JUNE 4, 2024**
BLUE SPRINGS R-IV SCHOOL )
DISTRICT, )
)
    Respondent. )

### Appeal from the Circuit Court of Jackson County, Missouri
### The Honorable Cory L. Atkins, Judge

### Before Division One: Lisa White Hardwick, Presiding Judge, Alok Ahuja, Judge, Anthony Rex Gabbert, Judge

R.M.A. appeals the judgment of the Jackson County Circuit Court on his claim for relief under the Missouri Human Rights Act. In three points on appeal, R.M.A. argues the trial court erred in granting judgment notwithstanding the verdict and in granting a new trial. The judgment is reversed and the cause remanded.

## Facts

In October 2014, R.M.A. filed a charge of discrimination with the Missouri Commission on Human Rights ("the MCHR") alleging sex discrimination by the Blue Springs R-IV School District ("School District"). The MCHR issued a right to sue letter in July 2015. R.M.A. filed his petition for damages in October 2015.

The petition alleged the following: R.M.A. is a female to male transgender teenager who was born as a female child and transitioned to living as a male in 2009 while attending fourth grade in the Blue Springs R-IV School District. R.M.A.'s name was changed to a name traditionally given to males in 2010. R.M.A.'s birth certificate was amended in December 2014 to reflect his present legal name and amend his sex designation from female to male.

R.M.A. and his mother expressed an interest in R.M.A. having access to the boys' locker room and restrooms while he attended eighth grade in the Blue Springs R-IV School District. School District refused to give that access. R.M.A. and his mother again requested that R.M.A. be given access to the boys' restrooms and lockers rooms when he began attending school at the Freshman Center in Blue Springs R-IV School District at the beginning of the 2014-2015 academic year. School District again denied that access even though R.M.A. had been issued an amended birth certificate recognizing his sex as male.

At the time R.M.A. filed his petition, he attended high school in the Blue Springs R-IV School District.[1] School District continued to deny R.M.A. access to the boys' restrooms and locker rooms while he was in high school. The petition alleged that other boys attending have regular, unrestricted access to the boys' locker rooms and restrooms in schools operated by School District.

---

[1] R.M.A. was in college at the time of trial.

School District has offered varying explanations for denying R.M.A. access to the same accommodations as the other boys. School District employees suggested that R.M.A. had been excluded from the boys' restrooms and locker rooms because of School District's belief that he had female genitalia. School District did not actually determine the nature of R.M.A.'s genitalia, however, and does not speculate, inspect, or otherwise inquire as to the genitalia of other male students. On the other hand, a member of School District's Board, and the principal at the time of R.M.A.'s high school attendance, testified that School District classified students for bathroom and locker room access based on the sex designation in the birth certificates which students' families provided to School District.

The petition alleged that School District discriminated and continued to discriminate against R.M.A. based on his sex. R.M.A. was deeply embarrassed and distressed by his exclusion from the boys' restrooms and locker rooms. School District had singled out R.M.A. for disparate treatment from other boys based on his sex.

R.M.A. participated in boys' physical education in middle school with the acquiescence of School District. R.M.A. participated in physical education in a home school placement during the spring semester of the 2014-2015 school year at his request while attending ninth grade because School District would not permit him to use the boys' locker room and restrooms, and R.M.A. wished to avoid the embarrassment and stigma of having to dress out for gym class in a separate room from the other boys.

3

R.M.A. participated in boys' athletics in the 2013-2014 school year, on the eighth grade boys' football team and eighth grade boys' track team while in middle school. During the eighth-grade football and track seasons, R.M.A. dressed out for practice and games in a separate, single-person, unisex bathroom outside the boys' locker room because School District refused to give him access to the boys' locker rooms. Unlike the locker room to which other boys had access, the single-person bathroom which R.M.A. was required to use did not contain lockers or shower facilities. R.M.A. chose not to participate in fall sports for the 2014-2015 school year in ninth grade due to being denied access to the boys' locker room and restrooms.

R.M.A.'s petition alleged he had been subjected to different requirements for accessing the services of the school because of his sex. Specifically, he had been required to use separate bathrooms from other boys on a daily basis and had been denied access to the boys' locker room if he wished to participate in boys' physical education or athletic activities. R.M.A. had received different and inferior access to public facilities because of his sex. As a result, R.M.A. felt embarrassed, singled out, and inferior to other boys. He continued to refrain from full participation in boys' physical education and athletics because School District had singled him out for disparate accommodations. School District had caused R.M.A. continued emotional distress. School District's conduct had caused R.M.A. loss of enjoyment of the facilities to which he was entitled to

4

access. The petition alleged one count for sex discrimination pursuant to section 213.010.[2] R.M.A. requested a jury trial.

In November 2015, School District filed a motion to dismiss for failure to state a claim because the school board and School District are not "persons" within the scope of section 213.010(14) and 213.065.2 and because the Missouri Human Rights Act does not extend its protections to claims based on gender identity. In June 2016, the trial court dismissed R.M.A.'s petition with prejudice. In February 2019, the Missouri Supreme Court reversed. It found that R.M.A.'s "petition alleges facts that (if taken as true, as required by the standard of review) establish the elements of a claim under section 213.065." *R.M.A. v. Blue Springs R-IV School Dist.*, 568 S.W.3d 420, 424 (Mo. banc 2019). The Supreme Court vacated the judgment dismissing the petition with prejudice and remanded the case to the trial court for further proceedings. *Id*. at 430.

The case proceeded to jury trial in December 2021. School District moved for a directed verdict at the close of R.M.A.'s evidence and again at the close of all evidence. The trial court denied the requests. On December 10, 2021, the jury returned a verdict in R.M.A.'s favor. It awarded him compensatory damages in the amount of $175,000 and

---

[2] All statutory citations are to RSMO as in effect in 2015 when R.M.A. filed his petition. "The applicable statute is typically the one in effect when the petition was filed." *R.M.A. by Appleberry v. Blue Springs R-IV Sch. Dist.*, 568 S.W.3d 420, 425 n.3 (Mo. banc 2019). "Accordingly, the Court assumes for purposes of this case that the August 2017 amendments to sections 213.010 and 213.065 do not apply here because R.M.A. filed his petition in October 2015." *Id*.; *see also Miller-Weaver v. Dieomatic Inc.*, 657 S.W.3d 245, 253-55 (Mo. App. W.D. 2022); *Bram v. AT&T Mobility Servs., LLC*, 564 S.W.3d 787, 794-95 (Mo. App. W.D. 2018).

punitive damages in the amount of $4,000,000. The trial court gave R.M.A. until January 14, 2022 to submit briefing on equitable relief and attorneys' fees.

On January 12, 2022, School District filed a motion for judgment notwithstanding the verdict ("JNOV") or, in the alternative, motion for new trial. School District listed multiple points of alleged error. School District stated that these errors, together, accumulated to support R.M.A.'s legally improper claim that he was discriminated against based on his transgender status rather than being discriminated against based on his male status.

On January 14, 2022, R.M.A. filed a motion for attorneys' fees, costs, equitable relief, and interest with incorporated suggestions in support. On January 28, 2022, R.M.A. filed his suggestions in opposition to School District's motion for JNOV or, in the alternative, new trial. On February 3, 2022, School District filed its suggestions in opposition to R.M.A.'s motion for attorneys' fees. On February 11, 2022, R.M.A. filed his reply suggestions in support of his motion for attorneys' fees. On February 14, 2022, School District filed its reply suggestions in support of its motion for JNOV or, in the alternative, new trial. On May 26, 2022, R.M.A. filed a supplement to his motion for attorneys' fees.

On May 27, 2022, the trial court entered an order granting in part and denying in part R.M.A.'s motion for attorneys' fees. It awarded $558,313.72 in fees and costs. The court awarded post-judgment interest at the rate of 5.75 percent. That same date, the trial court entered final judgment:

> Judgment is entered in favor of Plaintiff in the amount of $175,000.00 in compensatory damages, and $4,000,000.00 in punitive damages. Plaintiff is further awarded fees and costs in the amount of $558,313.72. The total judgment entered is $4,733,313.72.
>
> The Judgment shall bear interest at 5.75 percent, pursuant to Section 408.040, from this date forward until satisfied by the Defendant.

Also on May 27, 2022, the trial court entered an amended judgment granting the motion for JNOV or, in the alternative, new trial. The trial court stated that the Missouri Supreme Court instructed that the verdict director in R.M.A.'s case must read:

> Your verdict must be for plaintiff [R.M.A.] if you believe:
>
> First, defendants [School District and School Board] denied plaintiff full and equal use and enjoyment of the males' restroom and locker room facilities at defendants' school, and
>
> Second, plaintiff's male sex was a contributing factor in such denial, and
>
> Third, as a direct result of such conduct, plaintiff sustained damage.

The court's amended judgment stated:

> In part, the second element of the verdict director required Plaintiff prove his male sex was a contributing factor in Defendant's decision to exclude him from the male restroom and locker room facilities. The sole, uncontradicted evidence at trial was that Plaintiff was excluded from the male facilities because of his female genitalia. As a result, Plaintiff failed to establish a submissible case and Defendant is entitled to judgment notwithstanding the verdict.

The trial court entered JNOV in favor of School District. It conditionally granted School District's motion for new trial.

7

On June 27, 2022, R.M.A. filed a motion to amend the amended judgment. On July 14, 2022, School District filed its suggestions in opposition to the motion to amend the amended judgment. R.M.A. filed reply suggestions in support on July 26, 2022.

On September 19, 2022, the trial court entered its second amended judgment. That second amended judgment contained the same language as in the first amended judgment with respect to the second element of the verdict director. The trial court set aside the jury verdict and entered judgment in favor of School District. It clarified its conditional grant of a new trial:

> The Court would conditionally grant in part and deny in part Defendant's motion for new trial finding the verdict to be against the weight of the evidence in that the sole and uncontradicted evidence at trial was the school district made its decisions based on genitalia, not sex. The Court conditionally grants a new trial as to all claims.

This appeal follows.

## Standard of Review

"Missouri's Constitution expressly states that the Missouri Supreme Court 'shall be the highest court in the state' and that its 'decisions shall be controlling in all other courts.'" *Doe v. Roman Catholic Diocese of St. Louis*, 311 S.W.3d 818, 822 (Mo. App. E.D. 2010) (quoting Mo. Const. art. V, Section 2). "As such, we are constitutionally bound to follow the most recent controlling decision of the Missouri Supreme Court, and inquiries questioning the correctness of such a decision are improper." *Id*. (internal quotation marks omitted).

8

The Missouri Human Rights Act ("the MHRA") is a remedial statute. *Lampley v. Missouri Comm'n on Human Rights*, 570 S.W.3d 16, 22 (Mo. banc 2019). "Remedial statutes should be construed liberally to include those cases which are within the spirit of the law and all reasonable doubts should be construed in favor of applicability to the case." *Id*. (internal quotation marks omitted). The MHRA "is modeled after federal anti-discrimination laws, and thus federal law on the issue is strong persuasive authority." *Pollock v. Wetterau Food Distrib. Group*, 11 S.W.3d 754, 771 (Mo. App. E.D. 1999).

"The trial court's decision to grant a motion for JNOV is a question of law that we review de novo, and in doing so, we review to determine whether a submissible case was made." *Darks v. Jackson Cnty.*, 601 S.W.3d 247, 258 (Mo. App. W.D. 2020) (internal quotation marks omitted). "In reviewing the court's action, we indulge a presumption favoring the reversal of a JNOV, and we will not overturn a jury verdict unless there is a complete absence of probative facts to support the verdict." *Id*. (internal quotation marks omitted). "This presumption exists because [a] JNOV is a drastic action that can only be granted if reasonable persons cannot differ on the disposition of the case." *Id*. (internal quotation marks omitted).

"A case may not be submitted [to the jury] unless legal and substantial evidence supports each fact essential to liability." *McKinney v. Mercy Hosp. St. Louis*, 604 S.W.3d 680, 686 (Mo. App. E.D. 2020) (internal quotation marks omitted). "Substantial evidence is evidence, which, if true, is probative of the issues and from which the jury can decide the case." *Id*. (internal quotation marks omitted). "In determining whether the evidence

was sufficient to support the jury's verdict, the evidence is viewed in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict." *Id*. at 686-87 (internal quotation marks omitted). "This Court will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion." *Id*. at 687 (internal quotation marks omitted).

"A circuit court has broad discretion to grant one new trial on the ground that the verdict is against the weight of the evidence." *Mayes v. UPS, Inc.*, 593 S.W.3d 604, 614 (Mo. App. E.D. 2019) (citing Rule 78.02). "Its decision will be affirmed by an appellate court absent manifest abuse of that discretion." *Id*. "A trial court abuses its discretion when its decision is clearly against the logic of the circumstances and is so unreasonable and arbitrary that it shocks one's sense of justice and indicates a lack of careful consideration." *Id*. (internal quotation marks omitted). "The rationale that supports applying this standard of review is that [t]he trial court is in the best position to weigh the quality and quantity of the evidence and to determine whether justice has been done." *Id*. (internal quotation marks omitted). "If the trial court finds a verdict is against the weight of evidence, it must have the discretion to order a new trial to protect the right to a jury trial." *Id.* (internal quotation marks omitted). "Appellate courts must view evidence and all reasonable inferences therefrom in the light most favorable to the circuit court's order… when reviewing a trial court's ruling on the weight of the evidence relating to

remittitur, additur, or the grant of a new trial." *Id.* (internal quotation marks and emphasis omitted).

**Point I**

In his first point on appeal, R.M.A. argues that the trial court erred in granting JNOV because he made a submissible case. He states that evidence was presented that he was subjected to public accommodation discrimination and that his sex was a contributing factor for such treatment.

Section 213.065 governs discrimination in public accommodations. It provides in relevant part:

> 1. All persons within the jurisdiction of the state of Missouri are free and equal and shall be entitled to the full and equal use and enjoyment within this state of any place of public accommodation, as hereinafter defined, without discrimination or segregation on the grounds of race, color, religion, national origin, sex, ancestry, or disability.
>
> 2. It is an unlawful discriminatory practice for any person, directly or indirectly, to refuse, withhold from or deny any other person, or to attempt to refuse, withhold from or deny any other person, any of the accommodations, advantages, facilities, services, or privileges made available in any place of public accommodation, as defined in section 213.010 and this section, or to segregate or discriminate against any such person in the use thereof on the grounds of race, color, religion, national origin, sex, ancestry, or disability.

The elements of a public accommodation sex discrimination claim are:

> (1) plaintiff is a member of a class protected by section 213.065;
> (2) plaintiff was discriminated against in the use of a public accommodation (as defined by section 213.010); and
> (3) plaintiff's status as a member of a protected class was a contributing factor in that discrimination.

11

*R.M.A. by Appleberry*, 568 S.W.3d at 424–25. "There is no Missouri Approved Instruction (MAI) for submitting a plaintiff's public accommodation claim under section 213.065 to a jury." *Id*. at 425. "But MAI 38.01(A), which applies to employment discrimination claims under section 213.055, can be made applicable with only minor modifications." *Id*.

> Using MAI 38.01(A) as the starting point, therefore, a verdict director in this case would state (in substance if not in form):
>
> Your verdict must be for plaintiff [R.M.A.] if you believe:
>
> First, defendants [School District and School Board] denied plaintiff full and equal use and enjoyment of the males' restroom and locker room facilities at defendants' school, and
>
> Second, plaintiff's male sex was a contributing factor in such denial, and
>
> Third, as a direct result of such conduct, plaintiff sustained damage.

*Id*.

"To state a claim under the MHRA, R.M.A. must allege he is a member of a protected class." *Id.* at 427 n.7 (citing section 231.065.2). "Here, R.M.A. claims discrimination based on his sex and, therefore, he must allege he is either male or female." *Id*. "R.M.A. alleges he is a member of the male protected class…." *Id*.

12

As an initial matter, we first discuss School District's argument that JNOV was appropriate because R.M.A. is female and not male.[3] School District argues that R.M.A.'s gender might be male, but his sex is female. It relies on the dissent in *R.M.A. by Appleberry*, 568 S.W.3d at 431-32. The majority opinion by which we are bound, however, rejected the dissent's view of R.M.A.'s sex:

> The dissenting opinion apparently does not believe R.M.A.'s allegation [that he is male], citing R.M.A.'s allegations that he "is a female to male transgender teenager who was born as a female child and transitioned to living as male" and that he "is transgender and is alleged to have female genitalia." *Op.* at 431. In essence, the dissent suggests R.M.A.'s sex was determined by the genitalia he displayed at birth and can never be changed. But no lesser authority than the General Assembly has acknowledged that one's sex may not remain throughout a person's life what it was identified to be when that person was born. *See* § 193.215.9 ("Upon receipt of a certified copy of an order of a court of competent jurisdiction indicating the sex of an individual born in this state has been changed by surgical procedure and that such individual's name has been changed, the certificate of birth of such individual shall be amended.").

*Id.* at 427 n7.

> The dissenting opinion devotes unnecessary time and energy to construing the definition of the term "sex," and more broadly the phrase "discrimination ... on the grounds of ... sex." *See Op.* at 431–32. But there is nothing ambiguous about this term or the context in which it is used. After thousands of discrimination claims under the MHRA, it seems incredulous that this phrase suddenly – and without explanation – needs

---

[3] "The right to appeal is statutory, and section 512.020 extends that right only to parties who are 'aggrieved' by a judgment." *Rouner v. Wise*, 446 S.W.3d 242, 249 n.5 (Mo. banc 2014). School District was not aggrieved by the grant of JNOV. However, "this Court has long held that a respondent may attack erroneous rulings of the trial court for the purpose of sustaining a judgment in respondent's favor." *Id.* (internal quotation marks omitted). Because School District prevailed below, it is entitled to advance any argument in support of the JNOV. *Id.*

13

construction or that such construction should result in hitherto undiscovered elements. For instance, the dissenting opinion claims, with great confidence, "[t]he MHRA prohibits discrimination on grounds of biological sex," not legal sex. *Op.* at 431. Significantly, however, the MHRA makes no mention of "biological" or "legal" sex. Rather, the MHRA simply uses the word "sex," wholly unqualified. *See* § 231.065. It is telling that – in an opinion emphasizing the significance of adhering to the plain language of the statute – the dissent must add the word "biological" to the statute to reach its result.

*Id*. at 427 n.8.

As further support for its position that discrimination on the grounds of sex exclusively refers to biological sex, the dissenting opinion relies on *Pittman v. Cook Paper Recycling Corp.*, 478 S.W.3d 479 (Mo. App. 2015), and numerous federal circuit court cases. *Op.* at 432–33 n.4. Notably, however, none of these cases define the term "sex" exclusively to mean biological sex as the dissent does. Rather, the cases cited therein hold a plaintiff cannot claim the protection of Title VII based on either his or her (1) sexual orientation *status* … or (2) transgender *status* …. But in a case such as this where the plaintiff claims his discrimination was based on sex, neither set of cases is relevant. All of the above mentioned cases are distinguishable because, unlike the plaintiffs in those cases, R.M.A. does not claim protection under the MHRA based on his transgender status but, rather, based on his sex. *See* Petition at ¶ 35. Furthermore, in the same footnote, the dissenting opinion discusses the legislature's failure to adopt various proposed amendments to the MHRA. But "[c]ongressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change" and, therefore, this is also an unpersuasive basis upon which to interpret the statute. *United States v. Craft*, 535 U.S. 274, 287, 122 S.Ct. 1414, 152 L.Ed.2d 437, (2002) (alteration in original) (quotation marks omitted). *See also Zuber v. Allen*, 396 U.S. 168, 185, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969) ("Legislative silence is a poor beacon to follow in discerning the proper statutory route.").

*Id*. at 427 n.9.

14

In the series of footnotes quoted above, the Missouri Supreme Court plainly held that the term "sex" as used in section 213.065 is not limited to biological sex alone, and is not "determined [solely] by the genitalia [an individual] displayed at birth." *Id.* at 427 n7. The Court also recognized that an individual's "sex," for purposes of section 213.065, could be reflected in amendments to the individual's birth certificate.

In this case, R.M.A. was issued an amended birth certificate in December 2014, which states that he is male. Under the Supreme Court's decision in the prior appeal, that amended birth certificate alone establishes a sufficient basis for the jury to have concluded that R.M.A. is male. Moreover, by holding that R.M.A.'s petition was sufficient to state a claim, when that petition identified R.M.A. as an individual who was born female but transitioned to male, the Missouri Supreme Court necessarily held that R.M.A. could be considered to be of the male sex for purposes of an MHRA claim on the facts of this case. In addition, Dr. J.J., a professor of pediatrics and attending physician in pediatric endocrinology at Children's Mercy Hospital, testified as follows:

> A. Well, pretty much everybody is assigned a sex when they're born. When there are -- about once or twice a month we'll get a referral for a baby where they don't know what to assign, they don't know which gender to assign.
> …
> Q. Okay. Does it ever happen where the sex assigned is a mistake?
>
> A. Yes.
> …
> Q. Okay. So does that mean it's a guess?
>
> A. We usually – it's an estimate. You can look at the genitalia, you can do some blood tests. You can do chromosomes and try to make the best, try

15

to make the best estimate what gender the child will identify as. But we also tell the families, we also tell the families that we might be wrong to. We give them a list of things to watch for. And sometimes the gender we assign one sex and the child will prove us wrong.

…

Q. Is it accurate to say that gender or sex is a spectrum?

A. Yes, I would say both.

Q. Okay. Is there, in fact, a lot of people I believe are familiar with two chromosomal combinations, XX which describes ostensibly a theory describes a female person, correct?

A. That's a typical female.

Q. A typical female has XX chromosomes, and then there is XY which is what?

A. Typical male chromosomes.

Q. Are there more chromosomal combinations than just those XX and XY?

A. Yes, lots.

Q. You said lots?

A. Lot of different combinations.

Q. Do you know how many there actually are?

A. Oh, probably an infinite number. People can have multiple extra Xs, multiple extra Ys or both. Some patients will have some cells in their body 46XX and some 46XY. Some people have three different cell lines, some people have four different cell lines in their bodies.

…

Q. Is it fair to say, then chromosomes are not 100 percent indicator of a person's sex?

A. Right.

16

Q. In fact, it's just one factor; is that right?

A. Right.
…
Q. What does that actually tell us about a person's gender or their sex or their identity?

A. It's pretty complicated.

Q. It's pretty complicated. Is it fair to say that gender identity is hardwired?

A. There are certainly -- there are chromosomal. There are lots of biological contributions to gender identity.

Q. So to the best medical knowledge as a whole, what can you say about gender identity and biological component of gender identity?

A. There's lots of data from animal models and from various conditions that hormones, chromosomes and hormones play a large role in someone's gender identity, but there are other factors involved in gender identity as well.

Q. Okay. So is it fair to say that gender identity is biological?

A. There are biological, there are lots of biological contributions to gender identity.

Q. Okay. At one time was it believed that gender or sex was malleable?

A. Yes.
…
Q. So, Doctor, what can you tell us about the changeability of a person's sex?

A. Well, they used to -- people used to think that you could just change gender by the environment. It doesn't appear to be that case.
…
A. He started on blockers that fall, the fall 2011.

Q. Okay. So fall of 2011 he began?

17

A. Yes.

…

Q. Okay. So sitting here today can you say that [R.M.A.] is a male?

A. Yes.

Q. Was there one magic day when [R.M.A.] suddenly became male?

A. No.

Q. Is it accurate to say that he's been male as long as you've known him?

A. He's been male for as least as long as I've known him. When he came to me he identified as male.

…

Q. Let me ask you a little bit about that line in your letter. "These treatments include a surgical procedure for the purpose of gender modification." What surgical procedure was performed on [R.M.A.]?

A. He started on Depro shots and later was switched to an implant, puberty blocking implant.

…

Q. Okay. The last line of your letter states that, "[R.M.A.] should be considered male." Is that correct?

A. Yes.

Q. Is that your professional medical that [R.M.A.] should be considered male?

A. Yes.

…

Q. So how long in total did you treat [R.M.A.]?

A. Twelve years.

…

Q. Is there anything notable or remarkable about [R.M.A.'s] growth?

A. Yes, he grew very late.  He grew – females typically stop growing at the age of 15, and he continued to grow until he was 18.

Q. So [R.M.A.] continued to grow three years beyond when a biological female continues to grow -- or stops growing?

A. Yes.

Q. If [R.M.A.] were a biological female what would his expected height had been?

A. Around 5'8".

Q. Around 5'8".  And you said [R.M.A.], to your knowledge, is approximately 6'1" now?

A. Yes.

Q. How many inches is that in difference expected height and actual height?

A. Five inches different.

Q. Five inches different?

A. U.S. men are 5 inches taller than U.S. women.

Q. I believe you previously testified that [R.M.A.] was male the first time that he came to see you; is that correct?

A. Yes.

Q. How old was he when he first saw you?

A. Nine.

Q. So that would mean at the age of ten he was still male, correct?

A. Yes.

Q. How about at the age of 13?

A. Yes.

Q. How about at the age of 14?

A. Yes.

Q. And at the age of 18 when he graduated from high school?

A. Yes.

Q. As he's sitting here today can you conclusively say, in your medical opinion, that [R.M.A.] is a male and has been a male as long as you've known him?
…
A. Yes.
…
Q. Are there any particular surgeries that [R.M.A.] was able to avoid by the treatment that you administered to him?

A. Yes.

Q. What are those surgeries that he does not need?

A. He did not develop breasts and will not need top surgery.

Q. Okay. So is that a common surgery or surgical procedure performed on trans males?

A. Yes.

Q. And because of the treatment that you administered to [R.M.A.] he does not need that, right?

A. Well, it's either the treatment or something different about his biology is very rare. It's very rare for someone to have such a complete, complete lack of breast development.

Q. So he has a complete lack of breast development. Okay. Has [R.M.A.] ever had a menstrual cycle?

20

A. Not to my knowledge.

…

Q. When a person is assigned a sex at birth it's not always correct, is it?

A. Right, it's not always correct.

Q. Okay. Is it always -- what is your opinion when a person is assigned a sex at birth are you -- can doctors just at best make it a guess, or are they making a decision with certainty, with 100 percent certainty?

A. There's no certainty. Most of the time people are right. But having your -- most people take it for granted that their gender identity is going to agree with their birth sex, but it's certainly not always the case.

Q. Earlier you provided some testimony about chromosomes, and what counsel referred to as karyotype; is that correct?

A. Yes.

Q. And although [R.M.A.] has a karyotype of 46XX, does that exclude him from being male?

A. No, absolutely not.

…

Q. Is it accurate to say that [R.M.A.] both identifies as a male and in your opinion he is a male?

…

A. Yes.

…

Q. When you testified earlier about blockers and the purposes of blockers and what they do. Is it accurate to say they actually block hormone induced biological changes from happening?

A. Yes.

The next issue is whether sufficient evidence was presented supporting a finding by the jury that School District denied R.M.A. access to the boys' locker room because of his male sex. In its motion for JNOV, School District stated:

21

Plaintiff failed to establish his male sex was a contributing factor in the School District's decisions that Plaintiff asserts were unlawful discrimination, because all of the evidence was that the decisions about Plaintiff's access to male-designated bathrooms and locker rooms were based on Plaintiff's female anatomy, not his male sex.

The issue presented to this court on appeal is whether the jury could have concluded that R.M.A.'s male sex was a contributing factor in the discrimination based on the evidence presented at trial.[4] R.M.A. argues that School District treated R.M.A. differently because of a sex stereotype; namely, that men have one genitalia and women have different genitalia. R.M.A. states the evidence demonstrated that this stereotype is not true for everyone. Essentially, R.M.A. argues that he was discriminated against because he is the wrong kind of male.

"Stereotyping may give rise to an inference of unlawful discrimination upon a member of a protected class." *Lampley*, 570 S.W.3d at 24 (Mo. banc 2019) (a plurality opinion permitting a homosexual man to file charges of sex discrimination and retaliation against his employer based on the allegation that he did not exhibit the stereotypical attributes of how a male should appear and behave). "[T]he MHRA does not provide for 'types' of sex discrimination claims; a claim is either a claim of sex discrimination or it is not." *R.M.A. by Appleberry*, 568 S.W.3d at 426 n.4. "Rather than a 'type' of sex

---

[4] On appeal, R.M.A. argues that JNOV was improper because he made a submissible case with respect to the elements set out by section 213.065.2 and the verdict director. Our review of the record indicates that evidence was presented to support a finding that School District denied R.M.A. full and equal use and enjoyment of the males' restroom and locker room facilities and that R.M.A. sustained damage as a result of such conduct.

discrimination claim, 'sex stereotyping' merely is one way to *prove* a claim of sex discrimination, i.e., 'sex stereotyping' can be evidence of sex discrimination." *Id.* (emphasis in original).

> Remarks … that are based on sex stereotypes do not inevitably *prove* that gender played a part in a particular … decision. The plaintiff *must show* that the [alleged discriminator] actually relied on … gender in making its decision. In making this showing, stereotyped remarks can certainly *be evidence* that gender played a part.

*Id.* (internal quotation marks omitted) (emphasis in original); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 235 (1989) (holding it is discrimination based on sex for an employer to discriminate against a woman because she was not feminine enough).

R.M.A. presented a theory of sex stereotyping at trial. His counsel said the following in closing argument:

> Second element in that instruction. "Plaintiff's male sex was a contributing factor in such denial." [R.M.A.] is male. He's told us he's male that should be enough. That should have been enough for the School District when he said it in fourth grade. And we shouldn't be here, quite frankly. But it wasn't enough for them. It's still isn't enough as we sit here today in this room. In 2021 we are having this conversation where they are calling him female, female, female. Not male enough. Not male enough. Not male enough. Why? Why isn't he male enough? Why not? Because of an anatomical difference that was perceived by the School District. Sure, it's true. Okay. Now we all know. Great. Right. Why does that determine someone's sex? Ask yourselves. Because I asked their witnesses why? Why? What is that? Where do you get that information? Well, that's just my general stereotypical understanding of what that means.
> …
> The evidence does not support a conclusion that genitalia, external genitalia equals sex. They did not offer any expert testimony that says that. None. There's no evidence of that in the record.
> …

We obviously have explained that he's male. The birth certificate was a question, right? That was something that they raised, although it wasn't part of their policy. Then the birth certificate was submitted. So what then? What then? They still didn't change their decision, all through high school. They had years. It's not like they just had years with the birth certificate. They had years and this lawsuit. This started in 2014, and here we are in 2021 in front of you, the jury. And still they never changed their position the whole time he was in high school. They never changed their position afterwards. They haven't changed their position at this trial. They have the birth certificate. So what are they basing it on? Their preconceived notions. Their biases. Their stereotypes of what a male is which is not true and have not offered evidence to rebut our evidence.

…

Sure sometimes they let him be male when they use the right pronouns and the right thing. But and then other times he had to not be male, right? Not male enough. They weren't going to treat him as female, he was just not male enough, so he was ostracized.

…

It seems as plaintiff's mere presence him being a little bit different as a male. A different kind of male child was what? Was uncomfortable. The difference in male. Not fitting into this cookie cutter that they wanted him to.

School District argued in its motion for JNOV that it denied R.M.A. full use of the boys' locker room and restrooms because R.M.A. had female genitalia. As discussed, R.M.A. is male. Thus, School District essentially admits it discriminated against R.M.A. because he did not fit their idea of what a male is.

> As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group, for [i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.

*Price Waterhouse*, 490 U.S. at 251 (internal quotation marks omitted). Moreover, School District could not have denied R.M.A. access to the boys' facilities without considering

R.M.A.'s male sex and whether he met their full criteria for being a male. *See Lampley*, 570 S.W.3d at 24 ("Since *Price Waterhouse*, it is clear an employer who discriminates against women because, for instance, they do not wear dresses or makeup, is engaging in sex discrimination *because the discrimination would not occur but for the victim's sex.* Further, *Price Waterhouse* applies with equal force to a man who is discriminated against for acting too feminine.") (emphasis in original) (internal quotation marks and citations omitted). School District considered R.M.A.'s lack of male genitalia when discriminating against him. *See Self v. Midwest Orthopedics Foot & Ankle, P.C.*, 272 S.W.3d 364, 366 (Mo. App. W.D. 2008) (consideration of a gender related trait like pregnancy is discrimination based on sex).

Justice Neil Gorsuch's opinion in *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020) is instructive.

> [I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex. . . . [T]ake an employer who fires a transgender person who was identified as a male at birth but who now identifies as a female. If the employer retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth. Again, the individual employee's sex plays an unmistakable and impermissible role in the discharge decision.

*Id*. at 660. "[U]nlike [traits or actions like tardiness, incompetence, or simply supporting the wrong sports team], homosexuality and transgender status are inextricably bound up with sex." *Id*. at 660-61. "Not because homosexuality or transgender status are related to sex in some vague sense or because discrimination on these bases has some disparate

25

impact on one sex or another, but because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex." *Id*. "At bottom, these cases involve no more than the straightforward application of legal terms with plain and settled meanings." *Id*. at 662.

"For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex." *Id*. "When an employer fires an employee for being homosexual or transgender, it necessarily and intentionally discriminates against that individual in part because of sex." *Id*. at 665.

> There is no way for an applicant to decide whether to check the homosexual or transgender box without considering sex. To see why, imagine an applicant doesn't know what the words homosexual or transgender mean. Then try writing out instructions for who should check the box without using the words man, woman, or sex (or some synonym). It can't be done. Likewise, there is no way an employer can discriminate against those who check the homosexual or transgender box without discriminating in part because of an applicant's sex. … By discriminating against transgender persons, the employer unavoidably discriminates against persons with one sex identified at birth and another today. Any way you slice it, the employer intentionally refuses to hire applicants in part because of the affected individuals' sex, even if it never learns any applicant's sex.

*Id*. at 668-69. "[A]s we've seen, discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." *Id*. at 669.

As explained above, the School District's contention that it discriminated against R.M.A. because of his female genitalia itself necessarily establishes discrimination "on

26

the ground[ ] of . . . sex." Equally significant, the evidence at trial would have given the jury a substantial basis for questioning whether the School District's exclusion of R.M.A. from the male bathroom and locker room facilities was actually based on his genitalia. School District employees acknowledged that they did not actually *know* what genitalia R.M.A. had, but merely assumed that he had female genitalia because he had been assigned the sex of female at birth. Further, School District personnel acknowledged that they did not question, or require proof of, the genitalia of other students. A board member and former principal testified that the School District relied on *birth certificates* to establish the sex of School District students for purposes of bathroom and locker-room access; yet when R.M.A.'s family submitted a birth certificate identifying his sex as male, the School District did not change its treatment of him, and continued to refer to him as female even at trial. Dr. J.J. testified about typical males and typical females. She testified that R.M.A. is male even though he has a uterus and ovaries. She testified that he is male even though he has two X chromosomes. She testified that he is male even though he was assigned the sex of female at birth.

The evidence at trial, viewed in accordance with our standard of review, was that School District discriminated against R.M.A. because he did not fit their stereotype of what a male should be. This is no different than discriminating against a male because he is not tall enough or not muscular enough. School District discriminated against R.M.A. because his male sex did not fit their preconceived notions of what the male sex should

27

be.  This is discrimination based on R.M.A.'s male sex.  R.M.A. made a submissible case with respect to this element.

School District argues JNOV was appropriate with respect to R.M.A.'s claim for punitive damages because there was no evidence to show School District's evil motive or reckless indifference to the rights of others.[5]  "Under the MHRA, [a] submissible case [for punitive damages] is made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity that the defendant's conduct was outrageous because of evil motive or reckless indifference."  *Diaz v. Autozoners, LLC*, 484 S.W.3d 64, 88 (Mo. App. W.D. 2015) (internal quotation marks omitted).  "[D]irect evidence of intentional conduct is not required: punitive damages awards are evaluated on a case-by-case basis and [a]n evil intent may ... be implied from reckless disregard of another's rights and interests."  *Holmes v. Kansas City Missouri Bd. of Police Com'rs ex rel. Its Members*, 364 S.W.3d 615, 628 (Mo. App. W.D. 2012).  "The same evidence supporting the discrimination claim can also support a claim for punitive damages."  *Mignone v. Missouri Dept. of Corrections*, 546 S.W.3d 23, 41–42 (Mo. App. W.D. 2018) (internal quotation marks omitted).

---

[5] As noted above, School District may raise arguments in support of the grant of JNOV. *Rouner*, 446 S.W.3d at 249 n.5.  We note that School District does not challenge *the amount* of punitive damages awarded by the jury, but argues only that the evidence was insufficient to justify the award of punitive damages *at all*.

28

S.C., the principal at the middle school R.M.A. attended while R.M.A. was there, testified that he was not familiar with the MHRA. He was not aware of what the law is in Missouri regarding discrimination or segregation in schools. He stated that even though R.M.A.'s lawsuit was brought in 2015 and the trial did not occur until the end of 2021, School District had never admitted R.M.A. is male or changed any of its policies.

K.C., a member of the Blue Springs School Board, testified about R.M.A.'s mother's interaction with the school board. R.M.A.'s mother asked the school board if they would accept a United States passport and social security card as adequate documentation that R.M.A. is male. K.C. and the rest of the school board answered no to that question.

Q. Why did you do that?

A. Because that's not what we accept. The birth certificate is what we accept as far as determining gender if that's a question. Whenever a kid is enrolled in school we ask for a birth certificate.

Q. You say that the birth certificate determines gender?

A. Uh-huh.

Q. Is that right?

A. That's what we operate under, yes.

Q. Is that according to a policy?

A. Uh-huh.

Q. A written policy?

A. I don't know whether it's written or not, but that's what we used as a standard.

…

A. That was my feelings on it at the time, not strong feelings. My feeling was at the time we use the birth certificate that we already have.

Q. Have your feelings changed?

A. Not particularly

R.M.A.'s mother then asked if the school board received a corrected birth certificate stating he was male if he would be allowed to use the boys' facilities. K.C. stated that no action was taken or decision made on that question:

Q. And then the second paragraph is what I want to focus on for a minute. It says, "In response to the request contained within your February 10, 2014 letter, the Board does not think it prudent to make a decision at the present time based upon possible future events. In the event you provide the District with an amended birth certificate the Board certainly, at that time will review and consider the amended birth certificate and take all of appropriate actions at that time." Do you see that?

A. Yes, I do.

K.C. again stated that there was no written policy stating School District used birth certificates to determine gender. She testified that R.M.A. submitted an amended birth certificate to the school board, but he was still not allowed to use the boys' facilities.

S.Y., a former deputy superintendent of operations for School District testified that it was "a matter of practice" that School District relied on birth certificates to determine sex. With respect to R.M.A.'s mother's question about if School District would allow R.M.A. to use the boys' facilities if he obtained a corrected birth certificate, S.Y. testified:

30

Q. And then you attended another closed session Board meeting in which this request was discussed, right?

A. Yes. What I remember is that the Board kind of, for lack of a better word, tabling it until the birth certificate came in.

Q. Okay.

A. We all did, and then kind of tabling it is what I remember. I don't know about the documentation but that's what I recall.

Q. Sure. If the practice that you've described is that the School Board on the School District used birth certificates to determine gender or sex. Then why wouldn't they just say, yes, to [R.M.A.'s mother's] question, if you know?

A. I don't know. I don't recall.
…
Q. You were present. Do you recall a discussion as to why the Board didn't simply answer yes to [R.M.A.'s mother's] question?

A. No, but sometimes consideration goes into the fact that the Board changes, and they chose not to make a decision at that time until the amended birth certificate was provided.

Q. You were with the School District for 37 years?

A. Yeah.

Q. Am I right?

A. Yes.

Q. Thirty-seven years. During the entire 37 years that you have been there, do you recall the School District changing its practice regarding the sex marker and determining that from a birth certificate?
…
A. No.

R.M.A.'s mom testified about the ways she tried to work with School District to address R.M.A.'s issues. She asked for a meeting with superintendent P.K. but that request was denied. R.M.A.'s mother was told that, as an assistant superintendent, S.Y. would be handling the issues. R.M.A.'s mother asked to meet face-to-face with the school board. That request was also denied. R.M.A.'s mother was told that if the school board met with her then they would have to meet with hundreds of families. She stated:

Q. … how were you feeling at this time?

A. I was beginning to feel like each time I was trying to just be acknowledged that I was just – it was like I was getting patted on the head, that's what I felt like. Like, yes, dear, thank you. Thank you so much. That was it. I couldn't talk to the Board members. I couldn't get a straight answer.

Q. Is it fair to say that you were frustrated?

A. Yes.

R.M.A.'s mother testified that she submitted an amended birth certificate to School District but nothing changed.

The evidence at trial, viewed according to our standard of review, was that School District had an unwritten policy of using birth certificates to determine sex. Yet, School District refused to tell R.M.A.'s mother that it would honor a corrected birth certificate stating he is male because School District wanted to keep its options open in the event R.M.A. was able to obtain a corrected birth certificate. R.M.A.'s mother tried repeatedly for years to work with School District to resolve R.M.A.'s issues. The superintendent refused to meet with her. The school board refused to meet with her. Instead, School

District tried to placate R.M.A.'s mother with empty words. The School Board did not change its position or policies in the years between the filing of R.M.A.'s petition and the trial. This is sufficient evidence that School District acted with reckless disregard of R.M.A.'s rights.

Finally, School District claims it was entitled to a new trial on the alternate basis that the trial court erroneously admitted, and erroneously excluded, certain evidence. "The admission or exclusion of evidence lies within the sound discretion of the trial court and will not be disturbed absent clear abuse of discretion." *Sherrer v. Boston Scientific Corp.*, 609 S.W.3d 697, 705 (Mo. banc 2020).

School District first argues that the trial court erred by refusing to admit evidence concerning an unsuccessful mandamus proceeding which R.M.A.'s family had previously filed. In the mandamus proceeding, R.M.A.'s family sought to compel School District to give R.M.A. access to male bathroom and locker room facilities while he was still in school in the school district. Although School District's brief refers to a variety of documents filed in the mandamus proceeding, at trial School District merely requested that the court admit R.M.A.'s mandamus petition and the circuit court's judgment denying that petition. The trial court did not abuse its considerable discretion in excluding these legal documents, which were filed in a separate proceeding subject to different procedural and substantive standards. Admission of those documents presented a substantial risk of confusing the issues before the jury and would potentially have required substantial additional evidence to explain the meaning of those documents and

33

put them into an appropriate context. *See Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 874 (Mo. App. E.D. 2009) (noting that admission of a court ruling in separate litigation "raises serious implications of asking a lay jury to review and opine on the implications of a legal document containing conclusions of law based upon a shifting burden of proof that is not applicable to the case before them"), overruled on other grounds by *Wilson v. City of Kansas City*, 598 S.W.3d 888, 896 (Mo. banc 2020).

School District also argues that the trial court erroneously admitted evidence concerning the room assignments for an overnight school field trip, because that field trip was managed by a third party and not by School District. Although School District objected when R.M.A. sought to elicit testimony concerning this field trip from the former principal of the middle school which R.M.A. attended, it failed to object when R.M.A.'s mother separately offered extensive testimony concerning the room assignments for the field trip. "'A party cannot be prejudiced by the admission of allegedly inadmissible evidence if the challenged evidence is merely cumulative to other evidence admitted without objection.'" *Linton by Linton v. Carter*, 634 S.W.3d 623, 630 (Mo. banc 2021) (quoting *Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 134 (Mo. banc 2007)); *Sherrer v. Boston Scientific Corp.*, 609 S.W.3d 697, 714 (Mo. banc 2020) ("[b]y not objecting to each reference" to an allegedly inadmissible subject, or obtaining a continuing objection to such evidence, litigant failed to preserve admissibility issue for appellate review).

We recognize that, in *Swartz*, the Supreme Court stated that objections to later, similar evidence are not required "when testimony on a particular subject is objected to the first time it is offered and the court makes clear that it is rejecting the objection to all evidence of the same type." *Swartz*, 215 S.W.3d at 133. "In such cases, a failure to specifically object to each later piece of similar testimony may be forgiven on the basis that further objection would have been futile." *Id*. In the present case, however, when it overruled School District's objections to the testimony of the middle school principal, the trial court made clear that it had "concerns about the scope of the evidence that is coming in," and "about the probative versus prejudicial nature of some of this evidence." While the trial court stated that it was "confident in my rulings to this point," the trial court plainly signaled that additional evidence on the same topic might be subject to a meritorious objection. Because the trial court did not categorically rule that any and all evidence concerning the field trip would be admissible, School District was not excused from objecting when R.M.A.'s mother separately offered testimony on the topic. School District's failure to object to R.M.A.'s mother's testimony means that it failed to adequately preserve the objection it now raises. *See State v. Gott*, 523 S.W.3d 572, 578 n. 5 (Mo. App. S.D. 2017) (exception to contemporaneous objection requirement "does not apply here because the trial court did not make clear that it was rejecting the objection to all evidence of the same type when it overruled Defendant's objection to [earlier, similar] testimony").

R.M.A. made a submissible case. The grant of JNOV was error. The point is granted.

## Points II & III

In his second point on appeal, R.M.A. argues that the trial court erred in granting a new trial. He states that the trial court granted a new trial on non-discretionary grounds that are inaccurate as a matter of law because he had made a submissible case. Although *styled* as the grant of a new trial based on the weight of the evidence, the trial court's conditional new-trial ruling was plainly based on its view that the *only* evidence in the case was that School District had excluded R.M.A. from its facilities on the basis of his female genitalia. We have rejected that justification above, both as a legal and as a factual proposition. "The law is well established that if the plaintiff makes a submissible case, an order granting a new trial to the defendant after a verdict for the plaintiff for the reason that the plaintiff failed to make a submissible case would be arbitrary and an abuse of discretion." *Brooks v. SSM Health Care*, 73 S.W.3d 686, 691 n.5 (Mo. App. S.D. 2002) (citing *Lifritz v. Sears, Roebuck and Co.*, 472 S.W.2d 28, 33 (Mo. App. 1971)); *see also Alderson v. Clark Oil & Refining Corp.*, 637 S.W.2d 84, 88 (Mo. App. W.D. 1982).

In his third point, R.M.A. argues that the trial court erred in granting JNOV. He states that the trial court erroneously limited R.M.A.'s claim because the jury instructions were more limited than the scope of his claims. Given our holding in this case, we need not address Point III.

## Conclusion

The judgment is reversed. The matter is remanded with instructions for the trial court to enter judgment in accordance with its prior judgment. R.M.A. filed a motion requesting attorney fees and costs on appeal. "Section 213.111.2 authorizes the court to award court costs and reasonable attorney fees to a prevailing party." *Miller-Weaver v. Dieomatic Inc.*, 657 S.W.3d 245, 260 n.13 (Mo. App. W.D. 2022). We grant R.M.A.'s motion. On remand, the trial court should determine the reasonableness of the sums requested and enter an appropriate award. *Id*.

_____
Anthony Rex Gabbert, Judge

All concur.